115 P.3d 648

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Hal FELICIANO, Defendant–Appellant.**

No. 26273.

Supreme Court of Hawai'i.

July 5, 2005.

Phyllis J. Hironaka, Deputy Public Defender, on the briefs, for defendant-appellant Hal Feliciano.

Mark Yuen, Deputy Prosecuting Attorney, on the briefs, for plaintiff-appellee State of Hawai'i.

MOON, C.J., LEVINSON, NAKAYAMA, and DUFFY, JJ.; and ACOBA, J., Dissenting.

Opinion of the Court by DUFFY, J.

Defendant-appellant Hal Feliciano appeals from the Circuit Court of the First Circuit's judgment of conviction filed on November 19, 2003, the Honorable Richard K. Perkins presiding. Feliciano shot his cousin, Alex Stoesser, in the eye with a .22 caliber revolver. The circuit court convicted Feliciano on three counts: (1) attempted murder in the second degree (Hawai'i Revised Statutes (HRS) §§ 705–500, 707–701.5, and 706–656) [hereinafter, attempted murder in the second degree]; (2) place to keep pistol or revolver (HRS § 134–6(c) & (e)) [hereinafter, place to keep]; and (3) carrying, using or threatening to use a firearm in the commission of a separate felony (HRS §§ 134–6(a) & (e)) [hereinafter, use of a firearm]. Feliciano was sentenced as follows: (1) life with the possibility of parole and a three-year mandatory minimum term of imprisonment [1] for count one; (2) ten years for count two; and (3) twenty years for count three. On appeal, Feliciano argues that the circuit court erred

---

1. The circuit court sentenced Feliciano to serve a mandatory minimum term of imprisonment of three years pursuant to HRS § 706–660.1, entitled "Sentence of imprisonment for use of a firearm, semiautomatic firearm, or automatic firearm in a felony."

by: (1) violating the Hawai'i Constitution's double jeopardy clause when it (a) punished him for conduct by sentencing him to a mandatory minimum term of imprisonment pursuant to § 706–660.1 and then punishing him a second time for the same conduct with convictions of use of a firearm and place to keep, and (b) convicted him of attempted murder, place to keep, and use of a firearm; and (2) concluding that neither the HRS § 704–400 defense (entitled "Physical or mental disease, disorder, or defect excluding penal responsibility") or self-defense applied. We disagree with Feliciano, and affirm the circuit court's final judgment, guilty convictions, and sentences in all respects.

## I. BACKGROUND

### A. Event

On June 1, 2002, Stoesser (Feliciano's cousin) went to Delia Feliciano's (Feliciano's mother) [hereinafter, Delia [2]] house and gave her $600 ($100 was owed to Delia and $500 was a loan). Feliciano lived at Delia's house as well. Later that night Delia claimed that the money Stoesser gave her was missing; Stoesser (who had been drinking) refused to believe Delia and began arguing with her; Feliciano asked Stoesser to leave. The next morning, Stoesser returned to the Feliciano residence.

There was conflicting testimony as to what happened at this point. Delia testified that Feliciano told her that he would pay Stoesser the money and that when Stoesser and Feliciano left in Stoesser's truck they were going to an ATM to withdraw money. Feliciano testified that he went with Stoesser to throw away a couch and visit Stoesser's co-worker Graham [3] (who Stoesser also suspected of stealing the money). Stoesser testified that when he arrived at the house that morning Delia asked him to take Feliciano out of the house because they could not handle him. In any event, later that same morning, Feliciano and Stoesser left the Feliciano residence in Stoesser's truck. Sometime before noon, Feliciano and Stoesser got into an argument (while in Stoesser's truck) and Stoesser referred to Feliciano as a "stupid mother fucker." Stoesser saw that Feliciano had a gun and asked him "Why you bring the gun stupid mother fucker, you wanna shoot me?" Stoesser eventually stopped the car and told Feliciano to get out, saying "Get the fuck out stupid. What, you going shoot me? What's the problem?" A few moments later, Feliciano shot Stoesser in his right eye. After shooting Stoesser, Feliciano walked approximately two-tenths of a mile west of the shooting until he was disarmed and arrested by police who had been called by a witness to the shooting. After the police arrested Feliciano, they brought him to the Pearl City Police Station where his hands were processed for gunshot residue. Police Officer Chase Inamine testified that while the evidence specialist was processing Feliciano's hands Feliciano said, "I shot with my right."

### B. Feliciano's History of Mental Illness

In 1979, Feliciano suffered a mental breakdown while he was stationed in Germany with the United States Air Force. Feliciano was diagnosed as suffering from schizophrenia and was discharged from the Air Force in 1981 as 100% disabled due to his mental illness. Feliciano's mental illness has been characterized as a delusional belief that he possesses the supernatural power to control and transform others through the use of "supernatural devices" that may be invoked by using a television remote control. Feliciano also believed that he was one of several people: Hal, Halice, and Opel.[4] After his discharge from the Air Force, Feliciano received the prescription drug Risperdal to treat his mental illness; Risperdal is designed to control delusions, hallucinations and aggressiveness. During the months prior to the shooting Feliciano appeared to be taking less than his prescribed dosage of Risperdal. For some time prior to June 2, 2002, Feliciano was smoking marijuana regu-

---

2. In the circuit court's findings of fact and conclusions of law, Feliciano's mother's name is spelled "Delia." In the March 6, 2003 transcript, her name is spelled "Deelia."

3. Feliciano did not testify as to Graham's full name.

4. "Opel" is also referred to as "Opal" in the court transcripts.

larly and using methamphetamine at least once a week.

## C. *Trial, Convictions, and Sentences*

On June 10, 2002, the State of Hawai'i [hereinafter, prosecution] filed a complaint charging Feliciano with three counts: (1) attempted murder in the second degree in violation of HRS §§ 705–500 (1993),[5] 707–701.5 (1993),[6] and 706–656 (1993);[7] (2) place to keep in violation of HRS § 134–6(c) and (e) (Supp.2004);[8] and (3) use of a firearm in violation of HRS § 134–6(a) and (e).[9] The complaint also alleged that, under the attempted murder in the second degree

5. HRS § 705–500, entitled "Criminal attempt," provides in pertinent part:

> (1) A person is guilty of an attempt to commit a crime if the person:
> (a) Intentionally engages in conduct which would constitute the crime if the attendant circumstances were as the person believes them to be; or
> (b) Intentionally engages in conduct which, under the circumstances as the person believes them to be, constitutes a substantial step in a course of conduct intended to culminate in the person's commission of the crime.
> (2) When causing a particular result is an element of the crime, a person is guilty of an attempt to commit the crime if, acting with the state of mind required to establish liability with respect to the attendant circumstances specified in the definition of the crime, the person intentionally engages in conduct which is a substantial step in a course of conduct intended or known to cause such a result.

6. HRS § 707–701.5, entitled "Murder in the second degree," provides in pertinent part: "(1) Except as provided in section 707–701, a person commits the offense of murder in the second degree if the person intentionally or knowingly causes the death of another person."

7. HRS § 706–656, entitled "Terms of imprisonment for first and second degree murder and attempted first and second degree murder," provides in pertinent part: "(1) Persons convicted of first degree murder or first degree attempted murder shall be sentenced to life imprisonment without possibility of parole."

> HRS § 706–656 was amended in 1996, but those amendments were to subsection two, pertaining to murders which were "especially heinous, atrocious, or cruel." As this subsection is not applicable in the present case, we cite to the 1993 version of the statute.

8. HRS § 134–6 entitled, "Carrying or use of firearm in the commission of a separate felony; place to keep firearms; loaded firearms; penalty," provides in pertinent part:

> (a) It shall be unlawful for a person to knowingly carry on the person or have within the person's immediate control or intentionally use or threaten to use a firearm while engaged in the commission of a separate felony, whether the firearm was loaded or not, and whether operable or not; provided that a person shall not be prosecuted under this subsection where the separate felony is:
> (1) A felony offense otherwise defined by this chapter;
> (2) The felony offense of reckless endangering in the first degree under section 707–713;
> (3) The felony offense of terroristic threatening in the first degree under section [707–716(1)(a)], [707–716(1)(b)], and [707–716(1)(d)]; or
> (4) The felony offenses of criminal property damage in the first degree under section 708–820 and criminal property damage in the second degree under section 708–821 and the firearm is the instrument or means by which the property damage is caused.
> . . . .
> (c) Except as provided in sections 134–5 and 134–9, all firearms and ammunition shall be confined to the possessor's place of business, residence, or sojourn; provided that it shall be lawful to carry unloaded firearms or ammunition or both in an enclosed container from the place of purchase to the purchaser's place of business, residence, or sojourn, or between these places upon change of place of business, residence, or sojourn, or between these places and the following: a place of repair; a target range; a licensed dealer's place of business; an organized, scheduled firearms show or exhibit; a place of formal hunter or firearm use training or instruction; or a police station. "Enclosed container" means a rigidly constructed receptacle, or a commercially manufactured gun case, or the equivalent thereof that completely encloses the firearm.
> . . . .
> (e) Any person violating subsection (a) or (b) shall be guilty of a class A felony. Any person violating this section by carrying or possessing a loaded firearm or by carrying or possessing a loaded or unloaded pistol or revolver without a license issued as provided in section 134–9 shall be guilty of a class B felony. Any person violating this section by carrying or possessing an unloaded firearm, other than a pistol or revolver, shall be guilty of a class C felony.
> A conviction and sentence under subsection (a) or (b) shall be in addition to and not in lieu of any conviction and sentence for the separate felony; provided that the sentence imposed under subsection (a) or (b) may run concurrently or consecutively with the sentence for the separate felony.

9. For statutory text, see footnote 8.

charge, Feliciano was subject to sentencing in accordance with HRS § 706-660.1 (1993) [10] for use of a firearm while engaged in the commission of a felony.

On September 10, 2002, the circuit court appointed a three-member panel of examiners to determine Feliciano's fitness to proceed and the extent of Feliciano's penal responsibility. The appointed examiners were Richard Kappenberg, Ph.D. (a clinical psychologist), David Stein, M.D., Ph.D. (a psychiatrist), and Terence Wade, Ph.D. (a clinical psychologist). Reports from all three doctors were admitted into evidence, but only Dr. Kappenberg and Dr. Stein testified at trial.

On January 2, 2003, Feliciano filed a notice of intention to rely on a defense of mental disease, disorder or defect, pursuant to HRS § 704-400 (1993).[11] Feliciano's jury-waived [12] trial commenced on February 27, 2003 and concluded on March 6, 2003.

Dr. Kappenberg testified that he reviewed Feliciano's Oahu Community Correctional Center (OCCC) records and his records at Adult Probation (which provide information about past hospitalizations, police reports and Veterans' Administration records) and conducted a one and a half hour examination of Feliciano at OCCC. Based on the records and his examination, Dr. Kappenberg opined that Feliciano was suffering from a paranoid type of schizophrenia and polysubstance dependence at the time of the alleged offense. Dr. Kappenberg further opined that at the time of the offense, Feliciano's cognitive capacity was not impaired and that he was able to understand the difference between right and wrong. Dr. Kappenberg based his opinion on Feliciano's description of the event (which comported with the description given by other witnesses) and the fact that Feliciano specifically indicated that there was no connection between his beliefs (his supernatural ability to control others with a secret device) and his behavior that day. When asked about Feliciano's behavior when he was arrested by the police, i.e., telling the police to take care of his gun and that he shot with his right hand, Dr. Kappenberg stated that this showed that Feliciano was aware of what happened, that he participated, and that he was oriented and responding to his environment. Dr. Kappenberg was also asked about Feliciano's behavior when he was being questioned by the police, i.e., identifying himself as "Opel" and believing that he was in Germany; Dr. Kappenberg stated that this showed that Feliciano's mental functions had decreased significantly. Dr. Kappenberg opined that this decrease

10. HRS § 706-660.1, entitled "Sentence of imprisonment for use of a firearm, semiautomatic firearm, or automatic firearm in a felony," provides in pertinent part:

(1) A person convicted of a felony, where the person had a firearm in the person's possession or threatened its use or used the firearm while engaged in the commission of the felony, whether the firearm was loaded or not, and whether operable or not, may in addition to the indeterminate term of imprisonment provided for the grade of offense be sentenced to a mandatory minimum term of imprisonment without possibility of parole or probation the length of which shall be as follows:

(a) For murder in the second degree and attempted murder in the second degree—up to fifteen years;

(b) For a class A felony—up to ten years;

(c) For a class B felony—up to five years; and

(d) For a class C felony—up to three years. The sentence of imprisonment for a felony involving the use of a firearm as provided in this subsection shall not be subject to the procedure for determining minimum term of imprisonment prescribed under section 706-669; provided further that a person who is imprisoned in a correctional institution as provided in this subsection shall become subject to the parole procedure as prescribed in section 706-670 only upon the expiration of the term of mandatory imprisonment fixed under paragraph (a), (b), (c), or (d).

11. HRS § 704-400, entitled "Physical or mental disease, disorder, or defect excluding penal responsibility," provides:

(1) A person is not responsible, under this Code, for conduct if at the time of the conduct as a result of physical or mental disease, disorder, or defect the person lacks substantial capacity either to appreciate the wrongfulness of the person's conduct or to conform the person's conduct to the requirements of law.

(2) As used in this chapter, the terms "physical or mental disease, disorder, or defect" do not include an abnormality manifested only by repeated penal or otherwise anti-social conduct.

12. On February 27, 2003 Feliciano waived his right to a jury trial.

may have been caused by the stress of being arrested and placed in jail.

On cross-examination, Dr. Kappenberg was questioned as to why he did not conduct a further examination of Feliciano after reading the report about Feliciano's interview with the police. Dr. Kappenberg replied that there was no need for a further examination because there was no apparent connection between what Feliciano said at his police interview and his description of Feliciano's behavior at the time of the alleged offense. Dr. Kappenberg was further questioned as to whether Feliciano was taking his medication at the time of the incident; he responded that the records were unclear, but that Delia said that he would sometimes slip in taking his medications and Feliciano stated that he had not taken his medication for a long time, but was not clear as to how long this was. Dr. Kappenberg also testified that he was aware of Feliciano's history of mental illness dating back to 1979 and 1980.

Dr. Stein testified that he reviewed Feliciano's records[13] and examined Feliciano at OCCC for about an hour; based on his examination and review of records, Dr. Stein believed that Feliciano was "psychotic at the time of the offense" and that the psychosis was "most probably amphetamine-induced psychosis." Dr. Stein opined that the defendant's appreciation of the wrongfulness of his conduct was not substantially impaired at the time of the alleged offense. Dr. Stein's opinion was based on: his examination of Feliciano, where Feliciano told him that it was wrong to shoot people; Feliciano's statements to the police that he used his right hand to shoot Stoesser, demonstrating that he knew what he had done; and Feliciano's statement (during Dr. Stein's examination) that he would not have shot Stoesser if a police officer was standing there, showing that Feliciano knew that shooting Stoesser was wrong, and also demonstrating that Feli-

ciano had the ability to control his behavior. Dr. Stein also testified that he was aware of Feliciano's long history of mental illness, anti-psychotic medication use, and substance abuse.[14]

On November 19, 2003, the circuit court entered its judgment, guilty convictions, and sentences. The circuit court convicted and found Feliciano guilty on all three counts and sentenced him as follows: Count 1, life with the possibility of parole; Count 2, ten years; and Count 3, twenty years. The circuit court also granted the prosecution's motion to sentence Feliciano to a mandatory minimum term of imprisonment pursuant to HRS § 706–660.1 for Count 1 and accordingly sentenced Feliciano to a mandatory minimum of three years. Feliciano is currently incarcerated; he filed a timely appeal.

## II. STANDARDS OF REVIEW

### A. Constitutional Questions

"We answer questions of constitutional law by exercising our own independent judgment based on the facts of the case.... Thus, we review questions of constitutional law under the 'right/wrong' standard." *State v. Jenkins*, 93 Hawai'i 87, 100, 997 P.2d 13, 26 (2000) (citations, some quotation signals, and some ellipsis points omitted).

### B. Sufficiency of the Evidence

We have long held that evidence adduced in the trial court must be considered in the strongest light for the prosecution when the appellate court passes on the legal sufficiency of such evidence to support a conviction; the same standard applies whether the case was before a judge or a jury. The test on appeal is not whether guilt is established beyond a reasonable doubt, but whether there was substantial evidence

---

13. Dr. Stein testified that he reviewed police reports, reports relating to Feliciano's service in the Air Force, and post-discharge information from the Veterans' Administration. Dr. Stein stated that he did not review the OCCC records or the other doctors' reports.

14. Dr. Wade's report similarly concluded that Feliciano suffered from a mental disorder, but

that Feliciano's delusional beliefs were not connected to the shooting. Dr. Wade opined that Feliciano had the capacity to appreciate the wrongfulness of his conduct and was not substantially impaired by his mental disorder at the time of the alleged conduct. Furthermore, Dr. Wade stated that Feliciano believed he was acting in self-defense.

to support the conclusion of the trier of fact.

> *State v. Batson*, 73 Haw. 236, 248, 831 P.2d 924, 931, *recon[sideration] denied*, 73 Haw. 625, 834 P.2d 1315 (1992) (citations omitted); *see also State v. Silva*, 75 Haw. 419, [434], 864 P.2d 583, 590 (1993) (citations omitted). " 'Substantial evidence' as to every material element of the offense charged is credible evidence which is of sufficient quality and probative value to enable a [person] of reasonable caution to support a conclusion." *Batson*, 73 Haw. at 248–49, 831 P.2d at 931 (citation omitted). *See also Silva*, 75 Haw. at [432], 864 P.2d at 590 (quoting *State v. Matias*, 74 Haw. 197, 207, 840 P.2d 374, 379 (1993) [(1992)] ); *State v. Aplaca*, 74 Haw. 54, 64–65, 837 P.2d 1298, 1304 (1992) (citations omitted). *In Interest of John Doe, Born on January 5, 1976*, 76 Hawai'i 85, 92–93, 869 P.2d 1304, 1311–12 (1994); *see also State v. Valdivia*, 95 Hawai'i 465, 471, 24 P.3d 661, 667 (2001).

*State v. Martinez*, 101 Hawai'i 332, 338–39, 68 P.3d 606, 612–13 (2003)(alterations in original).

## III. *DISCUSSION*

### A. *Double Jeopardy in "Successive Prosecution" Cases*

#### 1. U.S. and Hawai'i Constitutional prohibitions against double jeopardy

Article 1, section 10 of the Hawai'i Constitution provides the following protection: "nor shall any person be subject for the same offense to be twice put in jeopardy[.]" The fifth amendment to the United States Constitution similarly provides that "nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb[.]" These constitutional safeguards are commonly referred to as providing protection against "double jeopardy."

█ In *State v. Lessary*, 75 Haw. 446, 865 P.2d 150 (1994), this court pointed out that double jeopardy provides protection in three scenarios: "It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." *Lessary*, 75 Haw. at 454, 865 P.2d at 154 (quoting *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969)).

#### 2. "Successive prosecution," "multiple prosecution," and "multiple punishments"

█ "Successive prosecution" cases occur when the defendant is prosecuted for an offense, then is prosecuted a second time for the same offense after acquittal or conviction. "Multiple prosecution" (again "multiple *prosecution*," not "multiple *punishments*") cases occur when the defendant is prosecuted for the same offense at the same time in two different courts, *e.g.*, district court and family court. Both "successive prosecution" and "multiple prosecution" cases require more than one prosecution. In contrast, in "multiple *punishments*" cases, there is a single prosecution after which the defendant is punished multiple times for the same offense.[15]

The *Lessary* facts presented one of the two "successive prosecution" scenarios (as distinguished from the "multiple punishments" scenario) following an alleged criminal episode (that spanned multiple hours) with his estranged wife as the victim. Lessary was charged by complaint in district court with terroristic threatening and kidnapping of his estranged wife (which was later amended to unlawful imprisonment). *Id.* at 449, 865 P.2d at 152–53. On the same day, Lessary was charged by complaint in family court with abuse of a family member. *Id.* at 449, 865 P.2d at 152. Lessary pled "no contest" to the abuse charge, and was sentenced to five days of incarceration and one year of probation. *Id.* at 449–50, 865 P.2d at 152. Lessary subsequently moved to dismiss the terroristic threatening and unlawful imprisonment charges on double jeopardy grounds. *Id.* at 450, 865 P.2d at 152. The motion to dismiss

---

**15.** This distinction is important because each situation invokes different aspects of the double jeopardy clause. As we conclude *infra*, this difference is also a justification for different tests for each type of case ("successive prosecution" and "multiple punishments").

was granted, and the prosecution appealed. *Id.* at 450–51, 865 P.2d at 152–53.

### 3. Possible tests in double jeopardy cases

In our analysis of double jeopardy in this "successive prosecution" case, this court discussed the three tests that courts have applied in determining whether offenses are the "same offense" for double jeopardy purposes:

1. The "same elements" test initially set forth in *Blockburger. v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932): "[t]he applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each requires proof of a fact which the other does not." *Lessary,* 75 Haw. at 452, 865 P.2d at 153 (quoting *Blockburger,* 284 U.S. at 304, 52 S.Ct. 180)(alteration in original).

2. The "same conduct" test set forth in *Grady v. Corbin,* 495 U.S. 508, 521, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990): "the Double Jeopardy Clause bars any subsequent prosecution in which the government, to establish an essential element of an offense charged in that prosecution, will prove conduct that constitutes an offense for which the defendant has already been prosecuted." *Lessary,* 75 Haw. at 457–58, 865 P.2d at 155 (quoting *Grady,* 495 U.S. at 521, 110 S.Ct. 2084).

3. The "same episode" test set forth in *Ashe v. Swenson,* 397 U.S. 436, 453–54, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970) (Brennan, J., concurring): "all offenses 'that grow out of a single criminal act, occurrence, episode, or transaction' " are considered to be the "same offense" for double jeopardy purposes. *Lessary,* 75 Haw. at 458, 865 P.2d at 155–56 (quoting *Ashe,* 397 U.S. at 453–54, 90 S.Ct. 1189).

### 4. The *Lessary* "same conduct" test is used in "successive prosecution" cases.

After discussing each of these tests in the context of the *Lessary* "successive prosecution" facts, we rejected the application of the *Blockburger* "same elements" test and the *Ashe* "same episode" test. *Lessary,* 75 Haw. at 457–59, 865 P.2d at 155–56. With respect to the "same episode" test, we concluded that while the double jeopardy clause should protect an individual from being twice put in jeopardy for a single act, it should not protect an individual from separate prosecutions for separate acts. *Id.* at 458, 865 P.2d at 156. With respect to the *Blockburger* "same elements" test, we concluded that its protection was inadequate in "successive prosecution" cases because its focus on the statutory definitions of offenses did not prevent the government from initiating multiple prosecutions against an individual based on a single act as long as the subsequent prosecutions were for offenses with "different" elements. *Id.* at 456–57, 865 P.2d at 155.

We held that the Hawai'i Constitution provides greater protection against "successive prosecutions" than does the United States Constitution, and adopted the "same conduct" test in "successive prosecution" cases:

> Although the double jeopardy clause of the United States Constitution does not bar the prosecution of either the Unlawful Imprisonment or Terroristic Threatening charges, we hold that the Hawai'i Constitution provides greater protection against multiple prosecutions than does the United States Constitution. The double jeopardy clause of the Hawai'i Constitution prohibits the State from pursuing multiple prosecutions of an individual for the same conduct. Prosecutions are for the same conduct if any act of the defendant is alleged to constitute all or part of the conduct elements of the offenses charged in the respective prosecutions. Under the "same conduct" test, prosecution of the Unlawful Imprisonment charge is barred while prosecution of the Terroristic Threatening charge is allowed.

*Id.* at 462, 865 P.2d at 157.

▆ We take this opportunity to reconfirm that the "same conduct" test is the proper test to be applied in "successive prosecution" cases to determine whether an offense is the "same offense" for double jeopardy purposes under our Hawai'i Constitution.

B. *Double Jeopardy in "Multiple Punishments" Cases*

### 1. *Jumila, Brantley,* and lesser included offenses (HRS § 701–109)

We most recently addressed the issue of double jeopardy in "multiple punishments" cases in *State v. Jumila,* 87 Hawai'i 1, 950 P.2d 1201 (1998), and *State v. Brantley,* 99 Hawai'i 463, 56 P.3d 1252 (2002).

In *Jumila,* we held that convictions of both second-degree murder (HRS § 707–701.5) and use of a firearm in commission of a felony (HRS § 134–6) were improper under HRS § 701–109 because the second-degree murder charge was an included offense of the firearm charge. *Jumila,* 87 Hawai'i at 3, 950 P.2d at 1203.

In *Brantley,* a plurality opinion with three justices concurring separately, we overruled *Jumila;* we held that a defendant can be convicted of both use of a firearm in the commission of a separate felony and the separate felony, despite the HRS § 701–109 statutory prohibition, where the legislature intended to allow convictions for both offenses. *Brantley,* 99 Hawai'i at 469, 56 P.3d at 1258. While the double jeopardy constitutional argument was implicated to the extent that the plurality opinion and concurring opinion of Justice Levinson acknowledged that HRS § 701–109 must be construed to provide the minimum protections afforded by the fifth amendment's double jeopardy clause, the parties and this court focused on the statutory interpretation of HRS § 701–109. *Id.* at 469 n. 8, 56 P.3d at 1258 n. 8.

These cases, however, primarily involved interpretation of HRS § 701–109 (1993), entitled "Method of prosecution when conduct establishes an element of more than one offense," which provides:

(1) When the same conduct of a defendant may establish an element of more than one offense, the defendant may be prosecuted for each offense of which such conduct is an element. The defendant may not, however, be convicted of more than one offense if:

    (a) One offense is included in the other, as defined in subsection (4) of this section; or

. . . .

(4) A defendant may be convicted of an offense included in an offense charged in the indictment or the information. An offense is so included when:

    (a) It is established by proof of the same or less than all the facts required to establish the commission of the offense charged; or

    (b) It consists of an attempt to commit the offense charged or to commit an offense otherwise included therein; or

    (c) It differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest or a different state of mind indicating lesser degree of culpability suffices to establish its commission.

In contrast, in this case, Feliciano bases his claims of double jeopardy violations on the double jeopardy clause of the Hawai'i Constitution. We will thus address the issue, for the first time, of which test we should apply to determine whether an offense is the "same offense" under the double jeopardy clause of the Hawai'i Constitution in multiple punishments cases.

### 2. *Lessary, Blockburger,* and *Dixon*

In *Lessary,* we explained that we will only extend the double jeopardy protections of the Hawai'i Constitution if we find that the protections afforded by the United States Constitution are inadequate. *Lessary,* 75 Haw. at 454, 865 P.2d at 154. Our analysis must thus begin with the protections provided under the United States Constitution in the "multiple punishments" scenario. In *Blockburger,* a "multiple punishments" case, the United States Supreme Court ruled that the double jeopardy clause protects defendants from receiving multiple punishments for the same offense, even in a single prosecution, and created the "same elements" test to implement that protection. As stated earlier herein, the *Blockburger* test held that "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each requires proof of a fact which the other does not." *Lessary,* 75 Haw. at 452, 865 P.2d at 153 (quoting *Blockburger,*

284 U.S. at 304, 52 S.Ct. 180). Put simply, in a "multiple punishments" case, if each offense has an element that the other does not, then there is no double jeopardy clause violation.[16] In *United States v. Dixon*, 509 U.S. 688, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993), the Supreme Court vigorously debated the issue of whether to apply the "same elements" or "same conduct" tests to "successive prosecution" cases before overruling *Grady* and holding that the "same elements" test applies; it appears settled at the federal level that the "same elements" test applies in "multiple punishments" cases as well as in "successive prosecution" cases.

**3.  The "same elements" test protects a defendant's double jeopardy rights and interests in a "multiple punishments" case.**

▪ Again, we have not previously adopted a test for determining whether an

offense is the "same offense" under the double jeopardy clause of the Hawai'i Constitution in "multiple punishments" cases.[17] Feliciano argues that the "same conduct" test this court has adopted for "successive prosecution" cases should apply to his "multiple punishments" case because: (1) it comports with the common sense notions of double jeopardy protections; and (2) it prohibits legislative "end-runs" around his constitutional double jeopardy protections.

We do not believe, however, that it is necessary to extend the protection of the *Lessary* "same conduct" test to "multiple punishments" cases. First, the rights and interests protected by the double jeopardy clause, as it applies in "multiple punishments" cases, are adequately preserved by the "same elements" test:

> [T]he Fifth Amendment double jeopardy guarantee serves principally as a restraint

---

**16.** If only one of the two crimes has an additional element, then one crime is a lesser included offense of the other. In this situation, the prosecution for the lesser included offense is barred by the "same elements" test. The double jeopardy clause protects against multiple punishments because it prevents the state from prosecuting the defendant for both the greater and the lesser offenses. *See Brantley*, 99 Hawai'i at 472, 56 P.3d at 1261 (Levinson, J., concurring).

**17.** In *State v. Santiago*, 8 Haw.App. 535, 540, 813 P.2d 335, 338 (1991), and *State v. Caprio*, 85 Hawai'i 92, 102, 937 P.2d 933, 943 (App.1997), the Intermediate Court of Appeals (ICA) concluded that *State v. Pia*, 55 Haw. 14, 18–19, 514 P.2d 580, 584 (1973), established a two-part test for "multiple punishments" cases in Hawai'i. The ICA first applied the *Blockburger* "same elements" test, then determined whether "the law defining each of the offenses is intended to prevent a substantially different harm or evil." *Santiago*, 8 Haw.App. at 541, 813 P.2d at 338 (quoting *Pia*, 55 Haw. at 18, 514 P.2d at 584); *Caprio*, 85 Hawai'i at 102, 937 P.2d at 943 (quoting *Pia*, 55 Haw. at 18, 514 P.2d at 584). However, the holding in *Pia* is very narrow and *Pia* does not establish the Hawai'i standard for constitutional "multiple punishment" cases. *See also Jumila*, 87 Hawai'i at 12 n. 5, 950 P.2d at 1212 n. 5 (Ramil and Nakayama, JJ., dissenting) (stating that *Santiago* and *Caprio* should be overruled because these cases improperly relied on dicta that did not adequately address the distinction between multiple punishments and successive prosecutions.)

In *Pia*, the defendants were charged with: (1) committing assault or battery on a police officer with the intent to obstruct the officer's duties;

and (2) willfully interfering with a police officer while the officer is lawfully executing his duties. *Pia*, 55 Haw. at 15, 514 P.2d at 582. The charging document had little in the way of factual allegations. *Id.* The defendants pled guilty to the second offense and then moved to dismiss the first count on double jeopardy grounds. *Id.* at 15–16, 514 P.2d at 582–83. The prosecution offered to prove that the offenses were based on separate and distinct acts; the trial court, however, looked only at the information in the charging document and ruled that both counts originated in the same factual transaction and that count two was a lesser included offense of count one. *Id.* at 16, 514 P.2d at 583. We held that "the State should have been afforded the opportunity to demonstrate that the first count of the information related to a factual incident separate from that upon which the defendants pleaded guilty in the second count." *Id.* at 17, 514 P.2d at 583–84. This holding is all that *Pia* stands for. In dicta, we also addressed the defendants' argument that count two was a lesser included offense of count one, but we concluded that the lesser included offense was not at issue because the prosecution was relying on two separate physical acts, not one. *Id.* at 17–18, 514 P.2d at 584. We did not establish a "Hawai'i rule" to determine when multiple punishments are barred by the Hawai'i Constitution's double jeopardy clause. *Id.* As such, *Santiago* and *Caprio* are overruled to the extent that these cases concluded that *Pia* established a "Hawai'i rule" applicable to "multiple punishment" cases because these cases misread *Pia* in reaching this conclusion.

on courts and prosecutors. The legislature remains free under the Double Jeopardy Clause to define crimes and fix punishments; but once the legislature has acted courts may not impose more than one punishment for the same offense.... Where consecutive sentences are imposed at a single criminal trial, the role of the constitutional guarantee is limited to assuring that the court does not exceed its legislative authorization by imposing multiple punishments for the same offense.

*Brown v. Ohio,* 432 U.S. 161, 165, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977).[18] In other words, the double jeopardy clause (as applied in "multiple punishments" cases) ensures that the courts cannot punish a defendant beyond what is authorized by the legislature. As such, the "same elements" test adequately preserves the protections afforded by the double jeopardy clause because it focuses on whether the legislature intended to allow the imposition of multiple punishments for the commission of a particular act, and ensures that the courts cannot punish a defendant beyond what was intended.

■ Second, in "multiple punishments" cases, we do not have the same concerns that caused us to apply the *Lessary* "same conduct" test in "successive prosecution" cases. As we expressed in *Lessary,* the dangers in "successive prosecution" cases are as follows:

Successive prosecutions, however, whether following acquittals or convictions, raise concerns that extend beyond merely the possibility of an enhanced sentence[.] The underlying idea, one that is deeply ingrained in at least the Anglo–American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity[.] Multiple prosecutions also give the State an opportunity to rehearse its presentation of proof, thus increasing the risk of an erroneous conviction for one

or more of the offenses charged. Even when a State can bring multiple charges against an individual under *Blockburger,* a tremendous additional burden is placed on that defendant if he must face each of the charges in a separate proceeding.

*Lessary,* 75 Haw. at 455–56, 865 P.2d at 154–55 (quoting *Grady,* 495 U.S. at 518–19, 110 S.Ct. 2084)(alterations in original). Third, a legislative "end-run" around constitutional double jeopardy protections is not possible so long as the legislature acts within its power to define criminal offenses and to set the punishment for those convicted of these offenses. *See Whalen v. United States,* 445 U.S. 684, 689, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980) ("[T]he legislative power to define offenses and to prescribe the punishments to be imposed upon those found guilty of them resides wholly with the Congress."); *State v. Rivera,* 106 Hawai'i 146, 158, 102 P.3d 1044, 1056 (2004) ("[T]he power to determine appropriate punishment for criminal acts lies in the legislative branch.)" (Quoting *State v. Bernades,* 71 Haw. 485, 490, 795 P.2d 842, 845 (1990).); *Bernades,* 71 Haw. at 490, 795 P.2d at 845 (stating further that the "courts cannot interfere unless the punishment prescribed appears clearly and manifestly to be cruel and unusual"). In "multiple punishments" cases, the double jeopardy clause serves as a constraint on the courts, ensuring that the court cannot impose punishment upon a defendant that is greater than what the legislature has authorized. As such, it is not possible to have a legislative end-run as long as the legislature is acting within its power.

The dissent disagrees with our analysis, contending that the "same conduct" test should be applied as *Lessary* is not limited to "successive prosecution" cases, and that *Lessary* extended double jeopardy protections against the legislature. We respectfully disagree. The facts of *Lessary,* discussed *infra,* show successive prosecution for abuse, terroristic threatening, and unlawful imprisonment, and not a multiple punishments scenario. As clearly stated by Justice Ramil in

---

**18.** When, on the other hand, successive prosecutions are at stake, the guarantee serves "a constitutional policy of finality for the defendant's ben-

efit." *Brown,* 432 U.S. at 165, 97 S.Ct. 2221 (quoting *United States v. Jorn,* 400 U.S. 470, 479, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971)).

*Jumila,* a multiple punishments case decided after *Lessary:*

"[T]here is a crucial distinction between *Lessary* and the present case—*Lessary involved successive prosecutions while the present case involves multiple punishments.* Successive prosecutions raise significant dangers that are not present in multiple punishment situations. These concerns justify a more rigorous standard for successive prosecution cases.

*Jumila,* 87 Hawai'i at 12, 950 P.2d at 1212 (Ramil, J., dissenting)(emphasis added). In addition, the dissent in *Brantley* acknowledged that *Lessary* did *not* decide the issue of whether the "same conduct" or "same elements" test applies to multiple punishments situations:

The question of whether *State v. Lessary,* 75 Haw. 446, 865 P.2d 150 (1994), or *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), applies to multiple punishments in a single prosecution has not been answered by this court. *See Tomomitsu v. State,* 93 Hawai'i 22, 31, 995 P.2d 323, 332 (App.2000)(Acoba, J. concurring) ("The supreme court has not expressly indicated which test applies under the Hawai'i Constitution in the multiple punishments situation.")

*Brantley,* 99 Hawai'i at 485, 56 P.3d at 1274 (Acoba, J., dissenting)(footnote omitted).

The dissent's contention that *Lessary* extended our double jeopardy protections against the legislature is belied by our subsequent decisions in *Jumila* and *Brantley.* In *Jumila,* discussed *infra,* we stated that the legislature could, if it desired, create an exception to the statutory prohibition set forth in HRS § 701–109 against convictions for both an offense and an offense included therein. *Jumila,* 87 Hawai'i at 4–5, 950 P.2d at 1204–05. In *Brantley,* we found that the legislature indeed did intend to permit convictions of both HRS § 134–6(a) and the separate felony (the included offense), and held that a defendant can be convicted of both offenses. *Brantley,* 99 Hawai'i at 469, 56 P.3d at 1258.

■ Our jurisprudence on this issue, grounded in the belief that the double jeopardy clause is primarily a restriction on the courts and the prosecution, which allows the legislature (within the boundaries of the eighth and fourteenth Amendments to the United States Constitution and article I, section 12 of the Hawai'i Constitution) to define crimes and fix punishments, is consistent with the jurisprudence of the United States Supreme Court. In addition, with the exception of Indiana cited in the dissent, we have been unable to locate any other jurisdiction, state or federal, whose majority has agreed with the dissent's argument; the dissent's premise (with the exception of Indiana) has been espoused solely in dissents. *See, e.g., Missouri v. Hunter,* 459 U.S. 359, 370, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983) (Marshall, J., dissenting) (stating that the legislature cannot authorize multiple punishments). We reject the dissent's argument as it is contrary to the double jeopardy jurisprudence of the United States Supreme Court and this court.[19] We consequently hold that the double jeopardy clause does not constrain the legislature from intentionally imposing multiple punishments upon a defendant for separate offenses arising out of the same conduct.

In conclusion, we believe that the protections afforded by the United States Constitution, as set forth in the *Blockburger* "same elements" test, adequately protect against double jeopardy in "multiple punishments" cases.

C. *Application of the Blockburger "Same Elements" Test to Feliciano*

Feliciano asserts that his rights to double jeopardy protection were violated when he was convicted of and sentenced for three offenses: (1) attempted murder in the second degree (HRS §§ 706–500, 707–701.5, and 706–656), with a sentence of life imprisonment with the possibility of parole, and a three-year mandatory minimum term sentence under HRS § 706–660.1; (2) place to keep pistol (HRS § 134–6(c) and (e)), with a

---

19. If we were to adopt the dissent's argument, HRS § 701–109 would be rendered unconstitutional because this statute authorizes the legislature to impose multiple punishments for separate offenses arising out of the same conduct.

ten-year sentence; and (3) use of a firearm in the commission of a separate felony (HRS § 134-6(a) and (e)), with a twenty-year sentence. Specifically, Feliciano contends that his constitutional double jeopardy rights were violated in two ways. First, he argues that the circuit court's sentence for use of a firearm in the commission of a separate felony constituted multiple punishments for the same offense in two ways: as between use of a firearm in the commission of a separate felony and HRS § 706-660.1, and as between using a firearm in the commission of a separate felony and attempted murder in the second degree. Second, he argues that the circuit court's sentence on place to keep constituted multiple punishments for the same offense in three ways: (a) as between place to keep and attempted murder in second degree; (b) as between place to keep and HRS § 706-660.1; and (c) as between place to keep and use of a firearm in the commission of a separate felony.

Application of the *Blockburger* "same elements" test to each violation of double jeopardy alleged by Feliciano reveals that Feliciano's constitutional rights have not been violated.

### 1. Use of a Firearm and Second Degree Attempted Murder

■ The elements of murder in the second degree are: (1) causing the death of another person; and (2) doing so intentionally or knowingly. HRS § 707-701.5. The elements of attempt are: (1) engaging in conduct which would constitute the crime if the attendant circumstances were as the person believed them to be; or (2) engaging in conduct which, under the circumstances as the person believes them to be, constitutes a substantial step in a course of conduct intended to culminate in the person's commission of the crime; and (3) engaging in either element (1) or (2) intentionally. HRS § 705-500.

Use of a firearm has the following elements: (1) carrying, having within the person's immediate control, using, or threatening to use a firearm; (2) while committing a separate felony; and (3) engaging in elements (1) and (2) knowingly. HRS § 134-6(a). Use of a firearm requires proof of fact that second degree attempted murder does not—that the person use a firearm. A person can commit second degree attempted murder with or without the use of a firearm. Attempted murder requires that the person intended to cause the death of another person—an element not present in the use of a firearm. Each offense has an element which the other does not, and thus is a separate offense for double jeopardy purposes.

Attempted murder is, however, an included offense of use of a firearm. As we discussed in *Jumila*, HRS § 701-109 prohibits convictions for both an offense and an offense included therein. However, in *Brantley*, 99 Hawai'i at 469, 56 P.3d at 1258, after examination of the legislative history of the use of a firearm statute (HRS § 134-6(a)), we held that: (1) the legislature intended to permit convictions of both HRS § 134-6(a) and the separate felony; and (2) HRS § 134-6(a) was a statutory exception to the prohibition against convicting for both an offense and an included offense set forth in HRS § 701-109. Therefore, per our holding in *Brantley*, Feliciano can be convicted of both attempted murder and of use of a firearm.

### 2. Place to Keep and Attempted Murder in the Second Degree

■ The elements of place to keep are: (1) carrying or possessing a loaded or unloaded firearm; (2) doing so when the firearm was not confined in an enclosed container; and (3) carrying or possessing the unenclosed firearm in a place other than the person's place of business, residence, or sojourn or between specific places (*i.e.*, place of purchase or repair, target range, police station, etc.). HRS § 134-6(c). Attempted murder in the second degree and place to keep do not share any common elements, and thus are separate offenses for double jeopardy purposes.

### 3. Place to Keep and Use of a Firearm

■ Both place to keep and use of a firearm require that the person carry a firearm. However, use of a firearm requires that the person commit a separate felony, an element not required by place to keep. Place to keep focuses on location (*i.e.*, whether the person was at an authorized location

or traveling between authorized locations), an element which is not present in use of a firearm. Place to keep and use of a firearm are thus separate offenses for double jeopardy purposes.

### 4. Conclusion

Each of the aforementioned offenses (attempted murder in the second degree, place to keep, and use of a firearm) contains elements which the others do not. Thus, the circuit court did not violate the Hawai'i Constitution's double jeopardy clause by convicting Feliciano of attempted murder in the second degree, place to keep, and use of a firearm.

D. *Double Jeopardy Does Not Bar Imposition of a Mandatory Minimum Term Sentence for Attempted Murder in the Second Degree When Feliciano Was Also Convicted of and Sentenced for Use of a Firearm in the Commission of Attempted Murder in the Second Degree as the Legislature Intended to Impose Multiple Punishments.*

■■■ We previously concluded, *supra,* that the circuit court did not violate Feliciano's rights under the Hawai'i Constitution's double jeopardy clause by convicting Feliciano of attempted murder in the second degree, place to keep, and use of a firearm. However, Feliciano also contends that his constitutional double jeopardy rights were violated when the circuit court imposed a mandatory minimum term sentence pursuant to HRS § 706–660.1 for attempted murder in the second degree when Feliciano was also convicted of, and sentenced for, use of a firearm in the commission of the separate felony of attempted murder in the second degree. We disagree.

### 1. Legislative intent is the proper analysis to apply in determining whether double jeopardy bars multiple punishments.

We previously discussed, *supra,* the legislature's power to define criminal offenses and

to determine appropriate punishments for the offenses. We held that the double jeopardy clause does not constrain the legislature from intentionally imposing multiple punishments upon a defendant for separate offenses arising out of the same conduct. The issue we are faced with in this case is thus whether the legislature intended to punish Feliciano under both HRS § 134–6(a) and HRS § 706–660.1 for use of a firearm in shooting Stoesser.[20]

### 2. The legislature clearly intended to punish a defendant multiple times if the defendant uses a firearm in the commission of a felony.

a. *1990 legislative history*

In 1990, the legislature amended HRS § 134–6 as follows (bracketed material deleted, new material underlined):

§ 134–6 **Possession or use of firearm in the commission of a felony;** [Place] **place to keep firearms; loaded firearms; penalty.** (a) It shall be unlawful for a person to knowingly possess or intentionally use or threaten to use a firearm while engaged in the commission of a felony, whether the firearm was loaded or not, and whether operable or not.

. . . .

[ (c) ] (d) Any person violating this section by possessing, using or threatening to use a firearm while engaged in the commission of a felony shall be guilty of a class A felony.

990 Haw. Sess. L. Act 195, § 2 at 422 (footnote omitted). In section 5 of the same bill, the legislature also amended language in HRS § 706–660.1.1990 Haw. Sess. L. Act 195, § 2 at 423–24. While the amendments to the mandatory minimum statute are not relevant (because they involve semi-automatic firearms) the fact that the legislature

---

20. The *Blockburger* "same elements" test applies to offenses only, and does not apply when comparing a mandatory minimum sentence statute and an offense. *Ball v. United States,* 470 U.S. 856, 861, 105 S.Ct. 1668, 84 L.Ed.2d 740 (1985)("For purposes of applying the *Blockburger* test in this setting as a means of ascertaining congressional intent, 'punishment' must be the equivalent of a criminal conviction and not simply the imposition of sentence.")

amended HRS § 134–6 in the same bill that contained the mandatory minimum sentence statute, HRS § 706–660.1, shows that the legislature was aware of both punishments and intended to punish a defendant who committed a felony while using a firearm multiple times.

b. *1993 legislative history*

In 1993, the legislature amended HRS § 134–6 as follows (deleted material bracketed; new material underlined):

§ 134–6 [Possession] **Carrying** or use of firearm in the commission of a separate felony; place to keep firearms; loaded firearms; penalty. (a) It shall be unlawful for a person to knowingly [possess] carry on the person or have within the person's immediate control or intentionally use or threaten to use a firearm while engaged in the commission of a separate felony, whether the firearm was loaded or not, and whether operable or not[.]; provided that a person shall not be prosecuted under this subsection where the separate felony is:

(1) A felony offense otherwise defined by this chapter;

(2) The felony offense of reckless endangering in the first degree under section 707–713;

(3) The felony offense of terroristic threatening in the first degree under section 707–716(a), 707–716(b), and 707–716(d); or

(4) The felony offenses of criminal property damage in the first degree under section 708–820 and criminal property damage in the second degree under section 708–821 and the firearm is the instrument or means by which the property damage is caused.

(b) It shall be unlawful for a person to knowingly possess a firearm with the intent to facilitate the commission of a felony offense involving the distribution of a controlled substance, whether the firearm was loaded or not, and whether operable or not.

1993 Haw. Sess. L. Act 239, § 1 at 418. The House Judiciary Committee stated that this amendment was to clarify that HRS § 134–6 "was not intended to apply to certain felonies which already have enhanced penalties for identical conduct." Hse. Stand. Comm. Rep. No. 472, in 1993 House Journal, at 1163. This amendment is significant, because while the legislature amended the statute to exempt certain felonies, it did not exempt the present situation, where the defendant is convicted of a separate felony (to which the mandatory minimum is attached) and use of a firearm.[21]

c. *1999 legislative history*

In 1999, the legislature amended HRS § 134–6 as follows (new material underlined):

(e) Any person violating subsection (a) or (b) shall be guilty of a class A felony. Any person violating this section by carrying or possessing a loaded firearm or by carrying or possessing a loaded or unloaded pistol or revolver without a license issued as provided in section 134–9 shall be guilty of a class B felony. Any person violating this section by carrying or possessing an unloaded firearm, other than a pistol or revolver, shall be guilty of a class C felony.

A conviction and sentence under subsection (a) or (b) shall be in addition to and not in lieu of any conviction and sentence for the separate felony; provided that the sentence imposed under subsection (a) or (b) may run concurrently or consecutively with the sentence for the separate felony.

1999 Haw. Sess. L. Act 12, § 1 at 12. The legislature made this amendment to clarify the law after this court issued *Jumila,* where we held that a defendant could not be punished for use of a firearm and a separate,

---

**21.** The Senate Judiciary Committee also stated that HRS § 134–6(a) "was not intended to permit charging of a separate felony for use of a firearm where the underlying felony involves a firearm and is classified as a felony for that reason alone." Sen. Stand. Comm. Rep. No. 1217, in 1993 Senate Journal, at 1210.

The Senate Judiciary Committee also stated that the legislature created the offense of "use of a firearm" to "recognize and deter the heightened danger presented when a firearm is involved in the commission of a felony such as burglary." Sen. Stand. Comm. Rep. No. 1217, in 1993 Senate Journal, at 1210.

underlying felony. The Senate Judiciary Committee stated that:

> The purpose of this bill is to clarify that any conviction or sentence for carrying or use of a firearm in the commission of a separate felony *shall be in addition to and not in lieu of* any conviction and sentence for the separate felony ....

Your Committee believes that *stronger and more certain penalties should be instituted to discourage the use of firearms in the commission of a felony and to provide a deterrent effect against such use.*

Your Committee finds that clarification in the law is necessary due to a recent Hawaii Supreme Court case, *State v. Jumila*, 87 Hawai'i 1, 950 P.2d 1201 (1998), in which the Court held that the offense of carrying or using a firearm in the commission of a felony was not punishable as a separate offense from the underlying felony. In *Jumila*, the majority and the dissent agreed that the legislature could, if desired, permit the conviction and sentencing for both offenses. However, the majority and dissent disagreed as to whether the legislature had done so. The majority found that there was insufficient legislative history to conclude that the legislature had intended separate convictions and sentencing. The dissent disagreed, citing prior case law and language in committee reports indicating that carrying or using a firearm in the commission of a felony could be charged in addition to the underlying offense.

Your Committee agrees with the dissent. Senate Standing Committee Report No. 1217 (1993 Senate Journal at 1210) clearly states "[A]n offender who uses a firearm in the commission of a felony can be charged with, *in addition to the underlying offense* a class A felony under section 134–6(a) and therefore be subject to enhanced penalty." (Emphasis added.)

> At the same time, your Committee recognizes and seeks to address another shortcoming in the law, as pointed out by the *Jumila* dissent. *The dissent noted that there was insufficient legislative intent to permit cumulative sentencing under section 134–6(a) and section 706–660.1 (sentence of imprisonment for use of a firearm in a felony). Your Committee believes that when the application of both statutes is based upon the same underlying felony, cumulative punishment is permissible.*

Sen. Stand. Comm. Rep. No. 843, in 1993 Senate Journal, at 1296 (Emphases added, third emphasis in original). This legislative history clearly shows that the legislature intended to punish defendants multiple times for both the underlying, separate felony (with a conviction and a mandatory minimum) and with a conviction for use of a firearm.

We note that our recent decision in *State v. Vellina*, 106 Hawai'i 441, 106 P.3d 364 (2005), and the recent decision of the ICA in *State v. Coelho*, 107 Hawai'i 273, 112 P.3d 759 (2005), are consistent with, but distinguishable from, our decision in this case.[22] In *Vellina*, the defendant allegedly stole two firearms from an apartment. *Vellina*, 106 Hawai'i at 445, 106 P.3d at 368. The defendant entered a plea of no contest to the charges against him, which included two counts of theft in the first degree. *Id.* at 444, 106 P.3d at 367. The prosecution requested, and the court granted, mandatory minimum terms of imprisonment (pursuant to HRS §§ 706–660.1(1)(c) and 706–660.1(3)(c)) as to both of the theft counts. *Id.* We stated:

---

**22.** Our decision today is also consistent with *State v. Ambrosio*, 72 Haw. 496, 496–97, 824 P.2d 107, 107–108 (1992), where the defendant pled no contest to charges of kidnaping and possession of a firearm in the commission of a felony (among other charges). The trial court imposed mandatory minimum terms of imprisonment for both the kidnaping charge and the possession of a firearm in the commission of the felony of kidnaping charge. *Id.* at 497, 824 P.2d at 108. We held that a defendant could be sentenced to a mandatory minimum term of imprisonment in connection with the kidnaping conviction, but could not be sentenced to a mandatory minimum term of imprisonment for the use of a firearm conviction. *Id.* at 498, 824 P.2d at 108. We based this holding on the fact that "[t]he legislature has chosen to make the use of a firearm in the commission of a felony the basis for enhanced sentencing for that felony, and it has also chosen to make such use a separate felony, but it clearly has not chosen to impose two mandatory minimum sentences for one use of a gun." *Id.* at 497–98, 824 P.2d at 108.

Vellina did not possess, use, or threaten the use of a firearm while engaged in the *commission* of the felonies of theft of a firearm and a semi-automatic firearm. Vellina's theft of a firearm *was* the entire felony; in other words, there was no underlying felony that Vellina committed while possessing or using a firearm.

*Id.* at 447–48, 106 P.3d at 370–71.

In *Coelho,* the defendant was a felon who was on probation; one of the terms of the defendant's probation was that he was not to possess any type of firearm. While executing a search warrant, police officers recovered a firearm from the trunk of the defendant's vehicle. The defendant was convicted of prohibited possession of a firearm and sentenced to a ten-year term of imprisonment. The trial court also imposed a mandatory minimum term of imprisonment for the possession of a firearm during the commission of a felony. Based upon statutory construction and Hawai'i case law, the ICA concluded that the trial court could not convict the defendant for possession of a firearm and sentence him for a mandatory minimum term of imprisonment based upon the same possession of a firearm because the legislature did not intend that the mandatory minimum term be applied where the entirety of the felonious conduct is the use or the possession of a firearm.

*Vellina* and *Coelho* are thus both distinguishable from the present case. In the present case, the mandatory minimum sentence was attached to a separate (from use of a firearm) felony—attempted murder; in contrast, in *Vellina* and *Coelho,* there was no separate felony and the trial courts improperly attached the mandatory minimum term of imprisonment to the use or possession of a firearm conviction.[23]

E. *HRS § 704–400 Defense and Self-Defense*

**1. HRS § 704–400 Defense**

■ Feliciano argues that the circuit court erred in relying on the opinions of Dr.

Stein and Dr. Kappenberg because both doctors failed to conduct a thorough examination of Feliciano. Specifically, Feliciano argues that Dr. Kappenberg and Dr. Stein failed to investigate Feliciano's health status in the weeks and months before the shooting and failed to ask Feliciano questions about critical delusional beliefs. We disagree.

The record shows that both doctors conducted a thorough examination of Feliciano. Both doctors testified that they reviewed Feliciano's records, including police reports, Veterans' Administration records, Adult Probation records, and reports of past hospitalization. Dr. Kappenberg also testified that he reviewed Feliciano's OCCC records. Both doctors also conducted clinical examinations of Feliciano where they spent a hour to an hour and a half examining Feliciano. Both doctors testified to their knowledge of Feliciano's history of mental illness. Thus, the record shows that both Dr. Kappenberg and Dr. Stein conducted a thorough examination of Feliciano.

The record also shows that the doctors investigated Feliciano's mental status during the time before the shooting. Both doctors testified as to Feliciano's pattern of taking (or not taking) his anti-psychotic medication and other drugs. Dr. Kappenberg also testified that Feliciano told him that he was not taking his anti-psychotic medication for a while before the shooting, indicating that Dr. Kappenberg's examination included an inquiry into Feliciano's mental state before the shooting.

Feliciano also argues that both doctors failed to make inquiries as to critical delusional beliefs; however, this argument is not persuasive because both doctors testified that Feliciano's delusional beliefs had no effect on his actions that day. Dr. Kappenberg testified that Feliciano knew the difference between right and wrong, could give a description of the event (and that the description comported with the accounts of other witnesses), and that Feliciano specifically indicated that his beliefs had no connection to the shooting. Dr. Stein similarly testified

---

**23.** The holdings of this court and the ICA are also consistent with the legislative history of

HRS § 706–660.1. *See supra* note 21.

that Feliciano knew that it was wrong to shoot people, was aware of the event, and was aware of his participation in that event. Dr.. Stein further testified that Feliciano's capacity to conform his conduct to the requirements of law was not substantially impaired at the time of the offense. All three doctors opined that Feliciano's delusional beliefs were not connected to the shooting and that Feliciano was not substantially impaired at the time of the shooting. In summary, there was substantial evidence to support the circuit court's conclusion that Feliciano was penally responsible for his conduct at the time he shot Stoesser.

## 2. Self-defense

▮ Feliciano also argues that the circuit court's conclusion of law that "the shooting of Stoesser was not justifiable under HRS § 703–304 has been proved beyond a reasonable doubt by the prosecution" is irrelevant because Feliciano did not raise self-defense.

▮ Self defense is a defense in any prosecution for an offense. HRS § 703–301(1) (1993); see also State v. Culkin, 97 Hawai'i 206, 215, 35 P.3d 233, 242 (2001). "Self-defense is not an affirmative defense, and the prosecution has the burden of disproving it once evidence of justification has been adduced." State v. Van Dyke, 101 Hawai'i 377, 386, 69 P.3d 88, 97 (2003) (quoting Culkin, 97 Hawai'i at 215, 35 P.3d at 242). Feliciano was charged with shooting Stoesser in the eye; this conduct constituted "deadly force." See HRS § 703–300 (1993) (defining deadly force as "force which the actor uses with the intent of causing or which the actor knows to create a substantial risk of causing death or serious bodily harm"). Such force would be justified if Feliciano believed that deadly force was necessary to protect himself against "death, serious bodily injury, kidnaping, rape or forcible sodomy." HRS § 703–304 (1993 and Supp.2004).[24] Feliciano testified that he acted in self-defense. On cross-

---

**24.** HRS § 703–304, entitled "Use of force in self-protection," provides:

(1) Subject to the provisions of this section and of section 703–308, the use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by the other person on the present occasion.

(2) The use of deadly force is justifiable under this section if the actor believes that deadly force is necessary to protect himself against death, serious bodily injury, kidnapping, rape, or forcible sodomy.

(3) Except as otherwise provided in subsections (4) and (5) of this section, a person employing protective force may estimate the necessity thereof under the circumstances as he believes them to be when the force is used without retreating, surrendering possession, doing any other act which he has no legal duty to do, or abstaining from any lawful action.

(4) The use of force is not justifiable under this section:

(a) To resist an arrest which the actor knows is being made by a law enforcement officer, although the arrest is unlawful; or

(b) To resist force used by the occupier or possessor of property or by another person on his behalf, where the actor knows that the person using the force is doing so under a claim of right to protect the property, except that this limitation shall not apply if:

(i) The actor is a public officer acting in the performance of his duties or a person lawfully assisting him therein or a person making or assisting in a lawful arrest; or

(ii) The actor believes that such force is necessary to protect himself against death or serious bodily injury.

(5) The use of deadly force is not justifiable under this section if:

(a) The actor, with the intent of causing death or serious bodily injury, provoked the use of force against himself in the same encounter; or

(b) The actor knows that he can avoid the necessity of using such force with complete safety by retreating or by surrendering possession of a thing to a person asserting a claim of right thereto or by complying with a demand that he abstain from any action which he has no duty to take, except that:

(i) The actor is not obliged to retreat from his dwelling or place of work, unless he was the initial aggressor or is assailed in his place of work by another person whose place of work the actor knows it to be; and

(ii) A public officer justified in using force in the performance of his duties, or a person justified in using force in his assistance or a person justified in using force in making an arrest or preventing an escape, is not obliged to desist from efforts to perform his duty, effect the arrest, or prevent the escape because of resistance or threatened resistance by or on behalf of the person against whom the action is directed.

(6) The justification afforded by this section extends to the use of confinement as protective force only if the actor takes all reasonable measures to terminate the confinement as soon as he knows that he safely can, unless the person confined has been arrested on a charge of crime.

examination, Feliciano testified that: (1) Stoesser told him that he had a sawed-off shotgun; (2) Feliciano thought that Stoesser was going to kill him; (3) when Feliciano and Stoesser got into an argument before the shooting, Stoesser hit Feliciano with his baton; and (4) Feliciano shot Stoesser because he thought that Stoesser was going to shoot him with his sawed-off shotgun. Feliciano further testified that he only shot Stoesser once because he did not want to kill him, he only wanted "to neutralize the threat." [25] Feliciano having raised the issue of self-defense, the circuit court did not err by concluding that the prosecution proved that Feliciano was not acting in self-defense when he shot Stoesser.

## IV. CONCLUSION

We affirm the circuit court's November 19, 2003 final judgment, guilty convictions, and sentences in all respects.

Dissenting Opinion by ACOBA, J.

In my view, the same act or series of acts cannot be used as the factual basis for convicting a person of more than one offense. In this case one act was used as the common factual basis upon which to hinge *all* offenses and the resulting convictions. I must, therefore, respectfully dissent.

The Hawai'i double jeopardy clause has been interpreted to afford greater protection than the double jeopardy clause of the United States Constitution. In *State v. Lessary*, 75 Haw. 446, 457, 865 P.2d 150, 155 (1994), this court "conclude[d under the facts in that case] that the interpretation given to the double jeopardy clause by the United States Supreme Court in [*United States v. ]Dixon* [, 509 U.S. 688, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993), did] not adequately protect individu-

als from being 'subject for the same offense to be twice put in jeopardy.'" "[B]eliev[ing] that the application of the *Grady [v. Corbin*, 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990)] rule [was] necessary to afford adequate double jeopardy protection, . . . [this court] adopt[ed] the 'same conduct' test under the Hawai'i Constitution." *Id.* at 459, 865 P.2d at 156.

### I.

Article I, section 10 of the Hawai'i Constitution states, in relevant part, "nor shall any person be subject for the same offense to be twice put in jeopardy[.]" [1] This court has recognized three traditional forms of double jeopardy protection that include protection against (1) "a second prosecution for the same offense after acquittal[,]" (2) "a second prosecution for the same offense after conviction[,]" and (3) "multiple punishments for the same offense." *Lessary*, 75 Haw. at 454, 865 P.2d at 154. The instant case would ostensibly fall under this third category.

The Supreme Court has never expressly defined "multiple punishments," the term apparently referring to every context other than that in which a defendant is prosecuted successively. But the United States Supreme Court's seminal double jeopardy case, *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), has been characterized as a "multiple punishments" case, inasmuch as the defendant was charged under various statutes *in a single action* apparently for the same act. *See Grady*, 495 U.S. at 516, 110 S.Ct. 2084. In *Blockburger*, the defendant was charged with, *inter alia*, "selling any of the forbidden drugs except in or from the original stamped package" and "selling any of such drugs not in pursuance of a written order of the person to whom the drug is sold." 284 U.S. at 303–04, 52 S.Ct. 180. He argued that, because the charges

25. Furthermore, on cross-examination, Feliciano's counsel questioned Stoesser as to whether he had any martial arts implements; Stoesser testified that he had nunchakus (a weapon which consists of a pair of hardwood sticks joined by a chain) and a baton. Feliciano's counsel further questioned Stoesser as to whether he had the implements the day of the shooting and whether he used them on Feliciano. Moreover, all three doctors stated that Feliciano described his actions as self-defense.

1. The Fifth Amendment of the United States Constitution states, in relevant part, "nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb[.]" Apparently this court has looked to federal decisions based on similar language in the federal constitution.

were for the same drug sale, they constituted "but one offense, for which only a single penalty lawfully may be imposed." *Id.* at 301, 52 S.Ct. 180. The Supreme Court held that "although both [statutes] were violated by the one sale, two offenses were committed." *Id.* at 304, 52 S.Ct. 180. According to the Supreme Court, "[t]he applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not." *Id.*

Subsequently, in *Grady*, the Court addressed double jeopardy protection in the "successive prosecutions" context. The defendant in that case pled guilty to two traffic tickets charging him with driving while intoxicated and failing to keep right of the median. Two months later he was charged with various homicide and assault offenses. 495 U.S. at 511–14, 110 S.Ct. 2084. The *Grady* majority of five justices held that the double jeopardy clause "bars a subsequent prosecution if, to establish an essential element of an offense charged in that prosecution, the government will prove *conduct* that constitutes an offense for which the defendant has already been prosecuted." *Id.* at 510, 110 S.Ct. 2084 (emphasis added). Thus, *Grady* marked a shift from the prior emphasis on "elements" to an evaluation of "conduct." Applying the "same conduct" test to the facts in *Grady*, the Court determined that

> [b]y its own pleadings, the State has admitted that it will *prove the entirety of the conduct for which [the defendant] was convicted—driving while intoxicated and failing to keep right of the median—to establish the essential elements of the homicide and assault offenses.* Therefore, the Double Jeopardy Clause bars this successive prosecution[.]

*Id.* at 523, 110 S.Ct. 2084 (emphasis added).

Later, in *Dixon*, the majority in a splintered Supreme Court overruled *Grady*. 509

U.S. at 704, 113 S.Ct. 2849. *Dixon* was a consolidation of two appeals, both addressing "whether prosecution for criminal contempt based on violation of a criminal law incorporated into a court order bars a subsequent prosecution for the criminal offense." *Id.* at 695, 113 S.Ct. 2849. Justice Scalia's majority opinion ended with an application of the *Blockburger* "same elements" test without applying the *Grady* "same conduct" test. *Id.* at 704, 113 S.Ct. 2849.

## II.

In *Lessary*, this court rejected the "same elements" test announced in *Blockburger* and later reinstated in *Dixon*, and adopted the *Grady* "same conduct" test under the Hawai'i Constitution. The defendant in *Lessary*, "[o]n April 5, 1991, ... was charged by complaint in district court with Terroristic Threatening and Kidnapping.[2] *On the same day*, Lessary was charged by complaint in family court with Abuse." 75 Haw. at 449, 865 P.2d at 152 (emphasis added).[3] The defendant in *Lessary* subsequently pled no contest to the abuse charge in family court on April 29, 1991. *Id.* The family court found him guilty of abuse and sentenced him to five days' incarceration and one year probation. *Id.* at 450, 865 P.2d at 152. On the following day, April 30, 1991, the defendant pled not guilty in circuit court and moved to dismiss the charges of terroristic threatening and unlawful imprisonment on double jeopardy grounds. *Id.* The circuit court granted the motion to dismiss. *Id.*

On appeal, this court held that "prosecution of the [t]erroristic [t]hreatening charge is barred if the State, to establish the *conduct element* of [t]erroristic [t]hreatening, will prove *acts* of the defendant on which the State relied to prove the conduct element of the [a]buse offense." *Id.* at 460, 865 P.2d at 157 (emphases added). The "conduct ele-

---

**2.** The Kidnapping charge was later amended to an Unlawful Imprisonment charge. 75 Haw. at 449 n. 4, 865 P.2d at 152 n. 4.

**3.** The "prosecutions" in *Lessary* were not clearly "successive." 75 Haw. at 450, 865 P.2d at 152.

Thus, in *Lessary*, this court referred to "multiple prosecutions." *Id.* at 457, 865 P.2d at 155 ("The protections must ensure that individuals are not subjected to multiple prosecutions for a single act.").

ment" of abuse was identified as "physically abusing a family or household member" and this court indicated that the defendant's acts of throwing the victim against a wall and dragging her from her office to his vehicle were used to satisfy that element. *Id.* at 460, 865 P.2d at 157. The "conduct element" of terroristic threatening was determined to be "threatening to cause bodily injury to another person." *Id.* The state maintained that it would rely on "different acts, namely [the defendant's] act of brandishing the scissors toward the victim and her co-worker in the office and his acts of pointing the scissors at the victim's stomach and telling her that he would stab her if she refused to enter his jeep, to prove that [the defendant] threatened to cause bodily injury." *Id.* at 461, 865 P.2d at 157.

Because the "conduct element" of terroristic threatening would be established by proof of acts *independent* of the acts alleged in the abuse prosecution, this court held that "the two offenses [were] not based on the 'same conduct' " and, therefore, the prosecution of the terroristic threatening charge was not barred under Hawaii's double jeopardy clause. *Id.* The *Lessary* "same conduct" test, then, involves two steps: (1) isolating the "conduct element" of both offenses and (2) determining whether the "acts" used to

satisfy the "conduct element" of the first offense would be[4] or were the same "acts" used to satisfy the "conduct element" of the second offense.[5]

This distinction between "act" and "conduct" is consistent with the Hawai'i Penal Code, which attributes different meanings to the terms. "Act" or "action" is defined as "a bodily movement whether voluntary or involuntary[.]"[6] Hawai'i Revised Statutes (HRS) § 701–118(2) (1993). "Conduct," as defined in HRS § 701–118(4) (1993), constitutes an act or omission or "a series" thereof.[7] Hence, the "conduct test" as applied in *Lessary* requires a comparison between the factual basis or "acts" used to convict, for example, under the first offense and the factual basis or "acts" used to convict under a second offense. If the factual bases for both offenses are identical, the offenses are the "same offense" for double jeopardy purposes. In other words, the defendant has been "subject for the *same offense* to be twice put in jeopardy."[8] Haw. Const. art I, § 10.

The "same conduct" approach is also consistent with this court's pre-*Lessary* decision, *State v. Pia*, 55 Haw. 14, 514 P.2d 580 (1973), which, although "rel[ying] primarily on statutory language," *State v. Brantley*, 99 Hawai'i 463, 485 n. 9, 56 P.3d 1252, 1274 n. 9 (2002) (Acoba, J., dissenting),[9] concluded that

4. Where a double jeopardy problem is foreseen at the pre-trial stage, a well-grounded motion for a bill of particulars to ferret out double jeopardy concerns, *i.e.*, whether the prosecution will rely on the same act or acts to prove its various charges, should be granted. *See State v. Pia*, 55 Haw. 14, 20 n. 7, 514 P.2d 580, 585 n. 7 (1973) ("Nor were defendants left without resources to ascertain before trial the factual basis of the prosecution's charges in view of the availability to them of a motion for a[b]ill of [p]articulars.")

5. Similarly, *Grady* held that "the [d]ouble [j]eopardy [c]lause bars any subsequent prosecution in which the government, to establish an *essential element* of an offense charged in that prosecution, will prove *conduct* that constitutes an offense for which the defendant has already been prosecuted." *Grady*, 495 U.S. at 521, 110 S.Ct. 2084 (emphases added.) *Lessary* employed the term "conduct element" in lieu of "essential element" and, at times, "acts" in lieu of "conduct." 75 Haw. at 460, 865 P.2d at 157.

6. This case is concerned with a "voluntary act" which is defined as "a bodily movement performed consciously or habitually as the result of

the effort or determination of the defendant." Hawai'i Revised Statutes (HRS) § 702–201 (1993).

7. HRS § 701–118(4) defines "conduct" as "an act or omission, or, where relevant, a series of acts or a series of omissions, or a series of acts and omissions[.]"

8. The *Lessary* court did not adopt the "same episode" test, under which "all offenses that grow out of .a single criminal act, occurrence, episode, or transaction would be considered the 'same offense' for purposes of determining whether the guarantee against being subject for the same offense to be twice put in jeopardy bars a second prosecution." 75 Haw. at 458, 865 P.2d at 155–56 (internal quotation marks and citation omitted).

9. In *Tomomitsu v. State*, 93 Hawai'i 22, 31 n. 4, 995 P.2d 323, 332 n. 4 (App.2000) (Acoba, J., concurring and dissenting), it was observed that, in interpreting *Pia* in *State v. Caprio*, 85 Hawai'i 92, 937 P.2d 933 (App.1997), the Intermediate Court of Appeals had concluded that "the appro-

"where a defendant in the context of one criminal scheme or transaction commits *several acts independently violative of one or more statutes*, he may be punished for all of them if charges are properly consolidated by the [s]tate in one trial[,]" 55 Haw. at 19, 514 P.2d at 585 (emphasis added). Contrary to the majority's assertions, this language in *Pia* was not "dicta," *see* majority opinion at 656, n. 17 (citing *State v. Jumila*, 87 Hawai'i 1, 12 n. 5, 950 P.2d 1201, 1212 n. 5 (1998) (Ramil, J., dissenting, joined by Nakayama, J.)), but an inherent basis for this court's ultimate holding that the "trial court committed error in denying the [s]tate the opportunity to demonstrate that the first count of its information rested *on evidence factually distinct and separate from the evidence supportive of the second count*, to which defendants pleaded guilty." 55 Haw. at 20, 514 P.2d at 585 (emphasis added).

Consequently, I do not agree that "the holding in *Pia* is very narrow." Majority Opinion at 656 n. 17. Although *Pia* did not expressly "establish the Hawai'i standard for constitutional 'multiple punishment' cases[,]" majority opinion at 656 n. 17, it indicated that the focus should be on the "acts" to be proved, 55 Haw. at 19, 20, 514 P.2d at 584, 585, when faced with a double jeopardy challenge to multiple charges in one trial, *id.* at 15, 514 P.2d at 582.

priate test for a multiple punishment situation was the *Blockburger* 'same elements' test and [an] added ... requirement that the law defining each of the offenses is intended to prevent a substantially different harm or evil." (Internal quotation marks, citation, and brackets omitted.) However, "I disagree[d] that the appropriate test include[d] the additional requirement." *Id.* Thus, the majority's decision to overrule *State v. Santiago*, 8 Haw.App. 535, 813 P.2d 335 (1991) and *Caprio* to that extent, majority opinion at 656 n. 17, is consistent with my position in *Tomomitsu*.

**10.** To accommodate the facts in *Lessary*, this court employed the term "multiple prosecutions," and the term "successive prosecutions." Strictly speaking, "successive prosecutions" are distinguishable from "multiple prosecutions."

Historically, double jeopardy presented itself in the form of *successive* trials, largely because of the prevailing criminal procedure of the time.

## III.

In *Lessary*, this court observed that the policy justifications for protecting against "successive prosecutions" as enunciated in *Lessary*, 75 Haw. at 456, 865 P.2d at 154–55, were just as applicable to "*multiple* prosecutions," *see id.* at 455–57, 865 P.2d at 154–55. Hence, although the majority characterizes *Lessary* as a "successive prosecution" case, majority opinion at 656, that cannot be reconciled with this court's repeated references to "multiple prosecutions" in that case.[10] In any event, such policy justifications, including protecting defendants from "embarrassment, expense and ordeal and compelling [them] to live in a continuing state of anxiety and insecurity[,]" *id.* at 455, 865 P.2d at 155, were not the only concerns in *Lessary*.

*Lessary* determined that the *Blockburger-Dixon* approach was inadequate because it did not protect against legislative intrusion. This court observed that "the State should not be allowed to circumvent the constitutional prohibition against double jeopardy *by creating a variety of courts, each having limited jurisdiction, in which to bring successive prosecutions* that could not otherwise be pursued." *Id.* at 457, 865 P.2d at 155 (emphasis added). Hence, the *Lessary* court emphasized as a fundamental principle, that double jeopardy protection "must ensure that individuals are not subjected to multiple prosecutions for a single act." *Id.*

The early principle of the English common law served to protect against repeated prosecutions. Once acquitted or convicted, the defendant was freed of the great power of the state. He could not be subjected to it again for the same offense. The problem of *multiple prosecutions at one trial* is a contemporary one arising from the proliferation of criminal statutes adopted by legislatures. Particular conduct may violate several statutes, giving prosecutors the option of several charges.

*Michigan v. Robideau*, 419 Mich. 458, 355 N.W.2d 592, 609–10 (1984) (Kavanagh, J., dissenting) (citations omitted) (emphases added). The language of the Hawai'i double jeopardy clause does not differentiate between "multiple prosecutions" at one trial or at two, *see State v. Van den Berg*, 101 Hawai'i 187, 195, 65 P.3d 134, 142 (2003) (Acoba, J., concurring) ("[T]here is no sound basis for applying a different test or application of the words 'the same offense' in article I, section 10 of the Hawai'i Constitution to situations implicating multiple punishments.").

For these reasons, this court declined to follow the *Blockburger-Dixon* "same elements" test, but, rather, adopted the "same conduct" test as set forth in *Grady*. It was "believe[d] that the application of the *Grady* rule [was] necessary to afford adequate double jeopardy protection[.]" *Id.* at 459, 865 P.2d at 156. The *Lessary* court adopted the *Grady* rule because it provided a functional balance, "*protect[ing] individuals from multiple prosecutions for the same act* without unnecessarily restricting the ability of the State to prosecute individuals who perform *separate acts* that independently constitute separate offenses." *Id.* (emphases added).

Consequently, no one can dispute that, in *Lessary*, this court departed from Supreme Court precedent in interpreting Hawaii's double jeopardy clause. The majority, however, interprets *Lessary* as rejecting the *Blockburger-Dixon* "same elements" test in the "successive prosecution" cases *only* and that in the "multiple punishment" context, "the 'same elements' test adequately preserves the protections afforded by the double jeopardy clause." Majority opinion at 659. But, contrary to the majority's approach, the critical point in *Lessary* was that the Hawai'i double jeopardy clause affords greater protection, independent from legislative circumvention. And plainly, despite the majority's contention, *Jumila* and *Brantley* did not at all decide the scope of our double jeopardy clause,[11] *see* majority opinion at 659–660, because *Jumila* and *Brantley* did not rest on the double jeopardy clause and did not analyze *Lessary*.

Even assuming, *arguendo,* that *Lessary* was a "successive prosecutions" case that did not address the double jeopardy protections afforded in the multiple punishments context, *see Brantley,* 99 Hawai'i at 486, 56 P.3d at 1275 (2002) (Acoba, J., dissenting) ("The question of whether ... *Lessary* ... or *Blockburger* ... applies to multiple punishments in a single prosecution has not been answered by this court.") (citing *Tomomitsu,* 93 Hawai'i at 31, 995 P.2d at 332 (Acoba, J., concurring and dissenting) ("The supreme court has not expressly indicated which test applies under the Hawai'i Constitution in the multiple punishments situation.")), the test we adopt today must uphold the *Lessary* principle that the Hawai'i double jeopardy clause stands between the individual and *all* branches of government.[12]

11. With all due respect, the majority's argument that the "dissent's contention that *Lessary* extended our double jeopardy protections against the legislature is belied by our subsequent decisions in *Jumila* and *Brantley*[,]" majority opinion at 660, is incorrect. "Although double jeopardy was raised by the defendant in *Jumila,* the *Jumila* decision was not premised at all on double jeopardy concepts, but only on a statutory analysis." *Brantley,* 99 Hawai'i at 484, 56 P.3d at 1273 (Acoba, J., dissenting). As for *Brantley,* a footnote in the plurality decision stated,

the United States and Hawai'i Constitutions forbid 'multiple punishments for the same offense'—*i.e.,* conviction of more than one offense when one offense is included within another, unless there is a clear legislative intent to the contrary. Our decision rests on the premise that such intent exists in this case. 99 Hawai'i at 469 n.8, 56 P.3d at 1258 n. 8.

However, as emphasized in the *Brantley* dissent, this solitary conclusory footnote, "made without the benefit of the [d]efendant's position[,]" *id.* at 486, 56 P.3d at 1275, and without so much as a citation, or a discussion of *Lessary,* cannot in principle serve as a holding that a legislative intent approach to double jeopardy protection was adopted.

12. The majority references statements in my dissenting opinion in *Brantley* and my concurring and dissenting opinion in *Tomomitsu,* majority opinion at 659, apparently for the proposition that the *Lessary* test does not govern the instant case. In *Brantley,* I stated that "the test to be applied in [multiple punishments cases] still has not been analytically addressed in this jurisdiction." 99 Hawai'i at 486, 56 P.3d at 1275 (2002) (Acoba, J., dissenting). This observation was made to answer the "plurality and Justice Levinson's concurring opinions, [which,] by addressing the legislature's intent [in construing HRS § 134-6(a)], appear[ed] to apply *Blockburger* rather than *Lessary* to [a] multiple punishments case[ ]" without saying so. *Id.* As was pointed out then, if such was the case, "[t]he plurality's determination ... that [the d]efendant's double jeopardy rights [were] not violated ... [was] made without the benefit of [the d]efendant's position[,]" *id.,* and, hence, the case should have been remanded to allow the defendant "the opportunity to be heard on the constitutional double jeopardy issue and the court and the parties to generate a record germane to that issue," *id.* at 487, 56 P.3d at 1276.

In this case, where the constitutional issue *is* squarely raised, it is evident that *Lessary* applies. The "benefit" of Defendant's and the State's positions, in addition to a "germane" record, crystallize the extent of Hawai'i double jeopardy pro-

## IV.

With all due respect, the majority decision today undermines the "greater protection" afforded in *Lessary*. First, the "rights and interests" protected by the Hawai'i double jeopardy clause include not only the right to be free from a second or contemporaneous *prosecution* for the "same act" but, also, the right to be free from a second *punishment* from such prosecution, as *Lessary* explained. 75 Haw. at 454, 865 P.2d at 154. *See State v. Tuipuapua*, 83 Hawai'i 141, 147, 925 P.2d 311, 317 (1996) ("[T]he government cannot prosecute or punish an individual for the same criminal offense more than once."). "[P]rotection from multiple punishment for the same offense lies at the core of the [d]ouble [j]eopardy [c]lause, and this protection is as applicable to single prosecutions as to two." *Michigan v. Robideau*, 419 Mich. 458, 355 N.W.2d 592, 610 (1984) (Kavanagh, J., dissenting).

Moreover, as established in *Lessary*, these rights are insulated from legislative, as well as judicial and executive, intrusion. For in *Lessary*, as noted before, a crucial justification for affording more protection under the Hawai'i double jeopardy clause was to prohibit the contravention of the clause through "creati[on of] a variety of courts[,]" 75 Haw. at 457, 865 P.2d at 155, in which to bring prosecutions for the same act. Hence, this court in *Lessary* extended double jeopardy protections as against the legislature. A

similar concern gave rise to a caution voiced by Justice Marshall. Acknowledging that a state "has wide latitude to define crimes and to prescribe punishment for a given crime[,]" *Missouri v. Hunter*, 459 U.S. 359, 370, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983) (Marshall, J., dissenting), Justice Marshall nevertheless asserted that if the legislature were not subject to the double jeopardy clause, multiple punishments could be imposed for the same act:

If the Double Jeopardy Clause imposed no restrictions on a legislature's power to authorize *multiple punishment*, there would be no limit to the number of convictions that a [s]tate could obtain *on the basis of the same act, state of mind, and result. A [s]tate would be free to create substantively identical crimes differing only in name,* or to create a series of greater and lesser-included offenses, with the first crime a lesser-included offense of the second, the second a lesser-included offense of the third, and so on.

*Id.* at 371, 103 S.Ct. 673 (emphases added). The view that the protection against multiple punishment for the same act is central to the double jeopardy clause has been more recently reiterated.

Neither precedent nor reason supports the ... contention that the Legislature is not restrained by the Double Jeopardy Clause. Such circular reasoning requires a

tection—that, to remain true to *Lessary*, the test we adopt in the multiple punishments context must guard against encroachment by all branches of government. As in *Brantley*, in the *Tomomitsu* separate opinion it was said that this court "has not expressly indicated which test applies under the Hawai'i Constitution in the multiple punishments situation." 93 Hawai'i at 31, 995 P.2d at 332 (Acoba, J., concurring and dissenting).

However, it was observed that the double jeopardy clauses of the federal and state constitutions were "not implicated" in *Tomomitsu* "because the robbery and charged thefts [did] not arise from the *same conduct, act, or transaction.*" *Id.* at 32, 995 P.2d at 333 (emphasis added). It was noted that

separate acts were charged by the State and admitted to by Tomomitsu. Count III regarding robbery referred to theft as the taking and carrying away of the camera and wristwatch from Alricson. The relevant facts were Tomomitsu's threat of force by exposure of a

weapon and the taking of property from Alricson's person or presence. In contrast, Counts I and II referred to the thefts as the disposal of the stolen items at different times. The relevant facts were the actual disposal of stolen property on specific dates to an undercover detective.

... The colloquy between Tomomitsu, the court, and attorneys confirmed the sale of the camera equipment and watch at different times and apparently at a place other than that of the robbery. Hence, the criminal *acts* of the robbery and each theft were supported by *different factual evidence and separated by time and space.*

*Id.* (emphasis omitted) (emphases added). Thus, inasmuch as "the offense charged and admitted to did not relate to the *'same conduct* [,]' " "affirm[ance of] Tomomitsu's convictions for theft in the first degree and in the second degree" would be proper. *Id.* at 34, 995 P.2d at 335 (emphasis added). My position in *Tomomitsu*, therefore, is consistent with my position today.

unique construction of an instrument which limits the government in all of its branches. *It would surely render the clause nugatory, for if legislative intent is the governing principle, that would render the courts and prosecutors impotent to effect the protection.*

More importantly, however, the ... argument ignores the evil of double jeopardy—that of punishing more than once for one wrong.... Multiple prosecutions do engender double jeopardy concerns that are not present in single prosecutions. *But protection from multiple punishment for the same offense lies at the core of the Double Jeopardy Clause, and this protection is as applicable to single prosecutions as to two.*

The legislature is free to define offenses. The beginning point of judicial resolution of whether two offenses are the same is the Legislature's definition of an offense. Legislative authority to define offenses, however, does not mean that it may subject a defendant to jeopardy under two offenses which are the same. Nor does it mean that legislative intent to separately punish may turn what is, in legal effect, one offense into two.

. . . .

In sum, although the legislative power is broad it cannot make a circle square by definition. Neither can it make the same offense two different crimes[.]

*Robideau,* 355 N.W.2d at 610–11 (Kavanagh, J., dissenting) (internal quotation marks and citations omitted) (emphases added). On its face, the shield afforded by the double jeopardy clause of the Hawai'i Constitution is not limited only as against the courts and the

prosecution. Our inquiry in the multiple punishment context, therefore, cannot be restricted only to what the legislature intended, inasmuch as what the legislature enacts may, as was said in *Lessary,* impair double jeopardy protection.[13]

## V.

Although the "concerns" cited in *Lessary* were attributed to "successive prosecutions," equally compelling justifications for protecting against "multiple punishment" exist. For in addition to multiple sentences,

each separate criminal conviction typically has *collateral consequences,* in both the jurisdiction in which the conviction is obtained and in other jurisdictions. The number of convictions is often critical to the collateral consequences that an individual faces. For example, a defendant who has only one prior conviction will generally not be subject to sentencing under a habitual offender statute.

Furthermore, each criminal conviction itself represents a pronouncement by the State that the defendant has engaged in conduct warranting the moral condemnation of the community. Because a criminal conviction constitutes a formal judgment of condemnation by the community, each additional conviction imposes an additional stigma and causes additional damage to the defendant's reputation.

*State v. Van den Berg,* 101 Hawai'i 187, 195, 65 P.3d 134, 142 (2003) (Acoba, J., concurring) (quoting *Hunter,* 459 U.S. at 372–73, 103 S.Ct. 673 (Marshall, J., dissenting, joined by Stevens, J.)) (citations omitted) (emphasis added). Hence, although the interest in guarding against "successive prosecutions"—

---

13. The majority holds "that the double jeopardy clause does not constrain the legislature from intentionally imposing multiple punishments upon a defendant for separate offenses arising out of the same conduct[,]" majority opinion at 660, and that, accordingly, "[l]egislative intent is the proper analysis to apply in determining whether double jeopardy bars multiple punishments[,]" *id.* at 32, 995 P.2d 323. Relegating the double jeopardy clause to a tool of statutory construction in this manner contravenes the greater protection announced in *Lessary.*

Again, in *Lessary* this court plainly recognized that legislative acts are subject to the Hawai'i

constitutional protection against double jeopardy,—a critical basis for affording greater protection than under its federal counterpart. *See* 75 Haw. at 457, 865 P.2d at 155. Therefore, I cannot agree that "[o]ur jurisprudence," majority opinion at 660, leaves the legislature free to punish defendants for the "same offense" multiple times over. *Lessary* stands as a testament against such a proposition. Accordingly, the majority's legislative intent analysis of HRS §§ 134–6 and 706–660.1, *see id.* at 31–38, 865 P.2d 150, is not germane in assessing whether a double jeopardy violation occurred in this case.

the "tremendous additional burden" of facing charges in a separate proceeding, *Lessary*, 75 Haw. at 456, 865 P.2d at 155,—is not implicated in the context of multiple charges in a single prosecution, the hazard of multiple punishments flowing therefrom for the same act, "collateral consequences," and "additional stigma" warrant the same level of double jeopardy protection in "multiple punishments" cases. Judicial scrutiny of potential multiple punishment violations is more imperative today. For under modern criminal procedure and due to the advent of a multiplicity of criminal offenses, the potential for abuse no longer rests in "successive prosecutions," but in the proliferation of charges in a single prosecution, amounting to "multiple prosecutions at one trial" which has become commonplace. *Robideau*, 355 N.W.2d at 610 (Kavanagh, J., dissenting).

In excluding the legislature and, in this case, the prosecution from the restraints of Hawaii's guarantee against double jeopardy, the majority upsets the balance *Lessary* struck between protecting the defendant from "multiple prosecutions for the same act" and allowing the "State to prosecute individuals who perform separate acts that independently constitute separate offenses." 75 Haw. at 459, 865 P.2d at 156. As opposed to the "same elements" formulation, the "same conduct" test complies with the mandate under the Hawai'i Constitution's double jeopardy clause to protect the individual from multiple punishments for the same act.

Accordingly, following the precedent expressly set down in *Lessary*, the "same conduct" test should be the unitary test for assessing double jeopardy claims under the Hawai'i Constitution. The majority's adoption of two separate tests, the applications of which would be governed by the Supreme Court's classifications, would inappropriately bifurcate the double jeopardy clause. As the debate in the Supreme Court has shown, the *Blockburger* and the *Grady* approaches are mutually exclusive.[14] By recognizing in *Lessary* that the legislature is constrained by the double jeopardy clause, this court adopted one of two diametric positions in the debate surrounding double jeopardy protection, that is, that the clause "limits the power of *all branches* of government." *Hunter*, 459 U.S. at 374, 103 S.Ct. 673 (Marshall, J., dissenting) (emphasis added). Thus, *Lessary* forecloses the majority's suggestion that our "jurisprudence" is "grounded in the belief that the double jeopardy clause is primarily a restriction on the courts and the prosecution." Majority Opinion at 660.

## VI.

The majority contends that "were [it] to adopt the dissent's argument, HRS § 701–109 would be rendered unconstitutional because this statute authorizes the legislature to impose multiple punishments for separate offenses arising out of the same conduct." Majority opinion at 660 n. 19. Preliminarily, I note that the parties do not address the constitutionality of HRS § 701–109 in their briefs and, hence, the issue should be reserved for a time when it is properly raised. However, in response to the majority's contention, HRS § 701–109 (1993) does not refer to "multiple punishments." Rather, it provides, in relevant part, that "[w]hen the same conduct of a defendant may establish an element of more than one offense, the defendant *may be prosecuted* for each offense of which such conduct is an element." HRS § 701–109(1) (emphasis added). Thus, on its face, HRS § 701–109 does not authorize multiple

14. As the Supreme Court's cases indicate, each approach is derived from diametric perceptions of the scope of double jeopardy protection—the *Blockburger-Dixon* "same elements" test grounded in the belief that the double jeopardy clause is primarily a restriction on the courts and the prosecution, *see Brown v. Ohio*, 432 U.S. 161, 165, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977) ("[T]he Fifth Amendment double jeopardy guarantee serves principally as a restraint on the courts and prosecutors. The legislature remains free under the Double Jeopardy Clause to define crimes and fix punishments[.]"), and the *Grady* "conduct" test borne from the understanding that the double jeopardy clause "limits the power of *all branches* of government[,]" *Hunter*, 459 U.S. at 374, 103 S.Ct. 673 (Marshall, J., dissenting) (emphasis added). Furthermore, two separate tests would compound the confusion that already plagues this area of law. By overruling *Grady*, the Supreme Court has returned to employing a unitary standard. *See Dixon*, 509 U.S. at 704, 113 S.Ct. 2849 ("[I]t is embarrassing to assert that the single term 'same offence' ... has two different meanings[.]")

punishments. The statute enumerates five situations in which "[t]he defendant *may not . . . be convicted* of more than one offense." [15] HRS § 701–109(1) (emphasis added). These five "exceptions" encompass a wide range of circumstances, reflecting the penal code's *"policy to limit the possibility of multiple convictions* and extended sentences when the defendant has *basically engaged in only one course of criminal conduct directed at one criminal goal,* or when it would otherwise be *unjust to convict the defendant for more than one offense."* Commentary on HRS § 701–109 (emphases added.) Hence, there is no discernible conflict with double jeopardy protection under *Lessary.* But again, absent a case in which HRS § 701–109 is said to authorize two convictions based upon the same acts, there is no reason to reach a supposed constitutional issue.

Furthermore, HRS § 701–109 is not pertinent to the disposition of this appeal, which does not involve a double jeopardy violation by the legislature, *i.e.,* a statutory challenge, but, rather, concerns a violation by the prosecution and the court. The double jeopardy violation here resulted from multiple convictions and, consequently, multiple punishments, that were all based on the same act— "fir[ing] a single shot into Stoesser's right

eye." Indeed, Defendant–Appellant Hal Feliciano (Defendant) acknowledges that the first circuit court (the court) "could have avoided a double jeopardy problem by finding [Defendant] guilty of [place to keep] based on different *acts."* (Emphasis added.) The prosecution established, and the court found, only one fact related to Defendant's conduct. *See Tomomitsu,* 93 Hawai'i at 33, 995 P.2d at 334 (Acoba, J., concurring and dissenting) (recognizing that the defendant's convictions "did not constitute multiple punishment for the same crime" where "[e]ach charged offense . . . rested on *distinct and separate acts* and one offense was not premised upon the occurrence or existence of the other offense") (emphasis added). Thus, pursuant to *Lessary,* Defendant could not be convicted of more than one offense.

## VII.

### A.

In arguing that the position herein is only supported by dissents, the majority seemingly disregards the fact that in interpreting the Hawai'i Constitution, we have adopted the positions of dissenting justices in United States Supreme Court cases.[16] Indeed, *Les-*

---

15. HRS § 701–109(1) lists the five situations as follows:

> The defendant may not, however, be convicted of more than one offense if:
> (a) One offense is included in the other, as defined in subsection (4) of this section; or
> (b) One offense consists only of a conspiracy or solicitation to commit the other; or
> (c) Inconsistent findings of fact are required to establish the commission of the offenses; or
> (d) The offenses differ only in that one is defined to prohibit a designated kind of conduct generally and the other to prohibit a specific instance of such conduct; or
> (e) The offense is defined as a continuing course of conduct and the defendant's course of conduct was uninterrupted, unless the law provides that specific periods of conduct constitute separate offenses.

16. *See, e.g., State v. Cuntapay,* 104 Hawai'i 109, 116, 85 P.3d 634, 641 (2004) (adopting Justice Ginsburg's dissent in *Minnesota v. Carter,* 525 U.S. 83, 106, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998), that short term guests have a protected right of privacy, inasmuch as " 'a guest should share his [or her] host's shelter against unreasonable searches and seizures' "); *State v. Lopez,* 78

Hawai'i 433, 451, 896 P.2d 889, 907 (1995) (adopting Justice Brennan's dissenting position in *Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), and holding that the prosecution is required to "present clear and convincing evidence that any evidence obtained in violation of article I, section 7 [of the Hawai'i Constitution] would inevitably have been discovered by lawful means before such evidence may be admitted under the inevitable discovery exception to the exclusionary rule"); *State v. Kam,* 69 Haw. 483, 490, 748 P.2d 372, 377 (1988) (adopting the dissenting view in *Pope v. Illinois,* 481 U.S. 497, 107 S.Ct. 1918, 95 L.Ed.2d 439 (1987), that "since the 'government may not constitutionally criminalize [the] mere possession or sale of obscene literature, absent some connection to minors, or obtrusive display to unconsenting adults[,]' the government cannot prosecute the sellers of pornography"); *State v. Santiago,* 53 Haw. 254, 265–66, 492 P.2d 657, 664 (1971) (adopting the dissent's view in *Harris v. New York,* 401 U.S. 222, 229–32, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), that using tainted Miranda statements interferes with an accused's right to testify in his own behalf, for the Hawai'i Constitution's privilege against self-incrimination requires "that before reference . . . at trial to state-

*sary* itself, in adopting the *Grady* conduct test embraced a minority position of the Supreme Court and established this jurisdiction's singular departure from the other jurisdictions. It bears repeating that even "[t]he Supreme Court has recognized that 'it is fundamental that state courts be left free and unfettered by the Court in interpreting their state constitutions.' *Bock v. Westminster Mall Co.,* 819 P.2d 55, 58 (Colo.1991) (quoting *Minnesota v. Nat'l Tea Co.,* 309 U.S. 551, 557, 60 S.Ct. 676, 84 L.Ed. 920 (1940))" and that "a state has a 'sovereign right to adopt in its own Constitution individual liberties more expansive than those conferred by the Federal Constitution.' *PruneYard Shopping [Ctr.] v. Robins,* 447 U.S. 74, 81, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980)." *State v. Viglielmo,* 105 Hawai'i 197, 214, 95 P.3d 952, 969 (2004) (Acoba, J., dissenting) (brackets omitted). "The neutral principal that should guide us is whether in a particular case, a 'sound regard' 'for the purpose' of the rights involved, warrants greater protection than that afforded under the federal constitution. [*State v.] Kaluna,* [55 Haw. 361,] 369, 529[520] P.2d [51,] 58 (1974)." *Id.* at 214, 95 P.3d at 969. In ascertaining the

ments made by the accused during custodial interrogation, the prosecutor must first demonstrate that certain safeguards were taken before the accused was questioned").

**17.** In interpreting the double jeopardy clause of its state constitution, the Indiana appellate courts have declined to follow *Dixon,* adhering instead to their own double jeopardy analysis. *See e.g. Grafe v. Indiana,* 686 N.E.2d 890 (Ind.Ct.App. 1997) ("[W]e conclude that the interpretation of the [d]ouble [j]eopardy [c]lause of the Indiana Constitution was not altered by *Dixon.*"); *Shipley v. Indiana,* 620 N.E.2d 710, 717 n. 2 (Ind.Ct.App. 1993) ("Despite the recent United States Supreme Court's decision in [*Dixon*], this [c]ourt is bound by our own supreme court's interpretation of the [d]ouble [j]eopardy [c]lause contained in the Indiana Constitution."). In *Shipley,* the Indiana Court of Appeals observed that its "supreme court requires that in addition to a *Blockburger* ... analysis, [it] must also look to the manner in which the offenses [were] charged and not merely the statutory definitions of the offenses." *Id.* "Moreover," said the court, "*when the same act constitutes two separate crimes, the very essence of double jeopardy principles prevents two separate convictions.*" *Id.* (emphasis added). Hence, in addressing the defendant's convictions for both murder and neglect of a dependent, the court held that "double jeopar-

boundaries of a constitutional guarantee, it is the policy and rationale inhering in the provision that must reign uppermost in divining the rule we should adopt.

### B.

I do observe that, as the majority notes, majority opinion at 660, the Indiana Supreme Court has construed its state double jeopardy clause to offer more protection than the federal double jeopardy clause. In doing so, that court has adopted a conduct-focused approach, termed the "actual evidence test," for all forms of double jeopardy scenarios, without distinguishing between successive prosecutions and multiple punishments cases. *Richardson v. Indiana,* 717 N.E.2d 32 (Ind. 1999).[17]

In *Richardson,* the defendant was convicted of, and sentenced for, both robbery and battery. *Id.* at 37. The Indiana Supreme Court addressed the application of the Indiana double jeopardy clause "as distinct from its federal counterpart in the Fifth Amendment to the United States Constitution."[18] *Id.* Justice Dickson, authoring the

dy precludes [the] conviction and sentence for both offenses," *id.* at 718, as follows:

At trial, the evidence showed that the acts which caused the victim's death were the combination of malnutrition, dehydration, and blunt force trauma over a period of time; *these acts cannot be used as the factual basis for both the neglect of a dependent charge and the murder charge, to do so would be to punish [the defendant] twice for the same acts.*

*Id.* at 717–18 (emphasis added.)

*Shipley* was based upon the Indiana Supreme Court case, *Hall v. Indiana,* 493 N.E.2d 433 (Ind.1986), which pre-dated *Grady* and *Dixon.* In *Hall,* the Indiana Supreme Court, noting that "the double jeopardy clause has been the subject of much intellectual struggle in American courts," relied on "Indiana precedent" to conclude that "[s]ince the [defendants'] continuous pattern of neglect was the factual basis for the neglect and reckless homicide convictions, *they were punished twice for the same acts.*" *Id.* at 436 (emphasis added.) Thus, the convictions and sentences for neglect of a dependent were vacated, but the convictions and sentences for reckless homicide were affirmed. *Id.*

**18.** The Indiana double jeopardy clause is similar to the Hawai'i double jeopardy clause, providing that "[n]o person shall be put in jeopardy twice for the same offense." 717 N.E.2d at 38 (quoting Ind. Const. art. I, § 14).

plurality opinion,[19] recognized that the Indiana Supreme Court "ha[d] not distinguished between double jeopardy protections in multiple punishment cases and those in subsequent prosecution cases." *Id.* at 43. Upon extensive analysis of the origins of double jeopardy protection, including Indiana common law, the plurality adopted a two-pronged "statutory elements test" and "actual evidence test."

> Synthesizing these considerations, we therefore conclude and hold that two or more offenses are the "same offense" in violation of Article I, Section 14 of the Indiana Constitution, if, with respect to *either* the statutory elements of the challenged crimes *or* the actual evidence used to convict, the essential elements of one challenged offense also establish the essential elements of another challenged offense. *Both of these considerations, the statutory elements test and the actual evidence test, are components of the double jeopardy "same offense" analysis under the Indiana Constitution.*

*Id.* at 49–50 (emphases in original) (emphasis added). Hence, "believing the original application of the Indiana Double Jeopardy Clause to be broader than" both the *Blockburger* test and the "manner in which the offenses are charged" analysis, the Indiana Supreme Court adopted both tests.[20] *Id.* at 53–54.

The "objective" of the statutory elements test

> is to determine whether the essential elements of separate statutory crimes charged could be established hypothetical-

ly. In this test, the charged offenses are identified by comparing the essential statutory elements of one charged offense with the essential statutory elements of the other charged offense.... Once the essential elements of each charged offense have been identified, the reviewing court must determine whether the elements of one of the challenged offenses could, hypothetically, be established by evidence that does not also establish the essential elements of the other charged offense.[21]

*Id.* at 50. Applying this test to robbery and battery, it was determined that the state "could hypothetically prove separate offenses without using the same evidence." *Id.* at 52. "Thus, under the statutory elements test, there [was] no double jeopardy violation." *Id.*

However, according to that court, "[e]ven if the first consideration, the statutory elements test, does not disclose a double jeopardy violation, the actual evidence test may." *Id.* at 53. Under the actual evidence test, the actual evidence presented at trial is examined to determine *whether each challenged offense was established by separate and distinct facts.* To show that two challenged offenses constitute the "same offense" in a claim of double jeopardy, a defendant must demonstrate a reasonable possibility that the evidentiary facts used by the fact-finder to establish the essential elements of one offense may also have been used to establish the essential elements of a second challenged offense.

*Id.* (emphasis added). In applying the actual evidence test, the appellate court concluded

---

**19.** The remaining four justices concurred or concurred in the result as follows: Shepard, C.J., concurred; Sullivan, J., concurred with a separate opinion; Selby, J., concurred in the result with a separate opinion; and Boehm, J., concurred in the result with a separate opinion, in which Selby, J., joined. 717 N.E.2d at 55. The concurring justices agreed "that the test for permitting convictions on two or more counts in the same trial is as the majority formulates it." *Id.* at 58 (Boehm, J., concurring, joined by Selby, J.). Justice Boehm, however, believed that the "dual convictions in a single case do not present an Indiana constitutional double jeopardy claim at all[,]" and would have reached the same result "without resort to constitutional doctrine because the dual convictions ... [were] barred by statutory and common law doctrines, irrespective of constitutional consideration." *Id.*

**20.** To reiterate, all five justices agreed "that the test for permitting convictions on two or more counts in the same trial is as the majority formulates it." 717 N.E.2d at 58 (Boehm, J., concurring, joined by Selby, J.).

**21.** The Indiana Supreme Court noted that this first "component" of its " 'same offense' analysis under the double jeopardy provision of the Indiana Constitution, is similar to the 'same elements' test, which comprises the federal double jeopardy analysis under *Blockburger*." 717 N.E.2d at 50 n. 41.

that "[f]rom the evidence presented, ... the defendant ha[d] demonstrated a reasonable probability that the evidentiary facts used by the jury to establish the essential elements of robbery were also used to establish the essential elements of the class A misdemeanor battery." *Id.* at 54. Thus, it was held that "convicting and sentencing defendant on both of these offenses violate[d] the Indiana Double Jeopardy Clause." [22] *Id.*

Although termed "the actual evidence test," the approach adopted by the Indiana Supreme Court, ensuring that each offense is "established by separate and distinct facts," *id.* at 53, is essentially the "same conduct" test of *Lessary. See supra.*

Following *Richardson,* in *Guyton v. Indiana,* 771 N.E.2d 1141, 1145 (Ind.2002), the Indiana Supreme Court addressed a factual scenario similar to this case, upholding convictions for murder and carrying a gun without a license. A plurality of the Indiana Supreme Court referred to but did not apply *Richardson,* opting instead to "adhere[ ] to a series of rules of statutory construction and common law that are often described as double jeopardy, but are not governed by the constitutional test set forth in *Richardson.*" *Id.* at 1143 (internal quotation marks and citation omitted). That court concluded that the defendant's convictions for murder and carrying a gun without a license did not fall under one of the common law areas of protection. The appellate court succinctly noted that "[c]arrying the gun along the street was one crime and using it was another." *Id.* (internal quotation marks and citation omitted).

In a concurring opinion, Justice Dickson, the author of the plurality opinion in *Richardson,* upon observing that the *Guyton* plurality did "not address th[e] constitutional

claim," *id.* at 1145 (Dickson, J., concurring), undertook an application of the *Richardson* test. [23] Justice Dickson determined that the state had demonstrated that the defendant had caused the victim's death by shooting him twice and that the state had showed that the defendant carried the gun *before* the shooting and later when he used it to shoot the victim. *Id.* Thus, according to Justice Dickson, "there was direct evidence, *apart from [the defendant's] firing the weapon,* that he carried a handgun without a license." *Id.* (emphasis added). The concurring justice agreed that the convictions were proper, but on the alternate basis that the defendant "failed to establish his claimed violation of the Indiana Double Jeopardy Clause." *Id.* at 1146.

The result in *Guyton,* whether based on the plurality's reasoning or the *Richardson* analysis undertaken by Justice Dickson, is consistent with the "same conduct" approach. If the prosecution establishes a factual basis or "acts" to satisfy the "conduct element" in murder, *independent* of the factual basis or "acts" to satisfy the "conduct element" in place to keep a firearm, both "offenses" are separate for double jeopardy purposes. However, where, as here, Defendant's three convictions are based on the same act, the Hawai'i double jeopardy clause precludes three separate convictions and punishments.

In any event, a sound regard for the purpose of the double jeopardy clause, as was expounded in *Lessary,* must ultimately guide us in the interpretation of our own constitution.

## VIII.

An analysis based on the same conduct test [24] should be applied to this case. Fol-

---

**22.** The court remedied the violation by vacating the conviction "with the less severe penal consequences" and leaving the robbery conviction to stand. 717 N.E.2d at 55.

**23.** Justice Boehm also wrote a separate concurring opinion to emphasize that the *Guyton* plurality made "no reference to the 'reasonable probability' standard" under *Richardson,* and, therefore, "this represents an abandonment of *Richardson* and a return to the pre-*Richardson* methodology of reviewing the evidence, instruc-

tions, charging instrument and argument of counsel under a de novo standard to determine whether it is more probable than not that the facts supporting one conviction are embraced within those supporting another." 771 N.E.2d at 1149 (Boehm, J., concurring).

**24.** Defendant urges this court to extend the "same conduct" test applied in *Grady* and in *Lessary* to "multiple punishment" cases because the "same conduct test" (1) "is simpler to apply," (2) "comports with double jeopardy law

lowing a jury waived trial, the court made the following findings of fact (findings):

16. ... [A]t about 11:50 a.m. on June 2, 2002, in the City and County of Honolulu, State of Hawai'i, *[Defendant] intentionally and knowingly used a .22 caliber revolver to fire a single shot into Stoesser's right eye.*

17. When [Defendant] shot Stoesser in the right eye, he intentionally engaged in conduct constituting a substantial step in a course of conduct that he was aware was practically certain to cause Stoesser's death.

18. At all relevant times, [Defendant] did not have a license to carry the revolver and was aware that this was so.

(Emphasis added.)

The court also rendered the following conclusions of law (conclusions):

1. Each essential element of the offense of Attempted Murder in the Second Degree in violation of HRS [§§ ] 705–500, 707–701.5, and 706–656, together with the state of mind applicable to each of those

under the state constitution in 'successive prosecution' cases," (3) "comports with the common-sense notion of double jeopardy protections," and (4) "prohibits legislative end-runs around the constitutional prohibition against double jeopardy via enactment of multiple statutes which each express a legislature's intent to violate double jeopardy."

25. HRS § 705–500, entitled "Criminal attempt," states that

(1) A person is guilty of an attempt to commit a crime if the person:

(a) *Intentionally engages in conduct which would constitute the crime if the attendant circumstances were as the person believes them to be;* or

(b) *Intentionally engages in conduct which, under the circumstances as the person believes them to be, constitutes a substantial step in a course of conduct intended to culminate in the person's commission of the crime.*

(2) *When causing a particular result is an element of the crime, a person is guilty of an attempt* to commit the crime *if, acting with the state of mind required to establish liability* with respect to the attendant circumstances specified in the definition of the crime, the person intentionally engages in conduct which is a substantial step in a course of conduct intended or known to cause such a result.

(3) Conduct shall not be considered a substantial step under this section unless it is

elements, has been proved beyond a reasonable doubt by the prosecution.

. . . .

3. Each essential element of the offense of Place to Keep Pistol or Revolver in violation of HRS [§ ] 134–6(c) and (e), together with the state of mind applicable to each of those elements, has been proved beyond a reasonable doubt by the prosecution.

4. Each essential element of the offense of Carrying, Using or Threatening to Use a Firearm in the Commission of a Separate Felony in violation of HRS [§ ] 134–6(a) and (e), together with the state of mind applicable to each of those elements, has been proved beyond a reasonable doubt by the prosecution.

Based on the foregoing, on November 19, 2003, the court convicted Defendant on the following three counts: (1) attempted murder in the second degree, HRS §§ 705–500 (1993),[25] 707–701.5 (1993),[26] and 706–656 (1993 & Supp.2002) [27] (attempted second de-

strongly corroborative of the defendant's criminal intent.

(Emphases added.)

26. HRS § 707–701.5, entitled "Murder in the second degree," provides that:

(1) Except as provided in section 707–701, a person *commits the offense of murder in the second degree if the person intentionally or knowingly causes the death of another person.*

(2) Murder in the second degree is a felony for which the defendant shall be sentenced to imprisonment as provided in section 706–656.

(Emphasis added.)

27. HRS § 706–656 (Supp.2002), entitled "Terms of imprisonment for first and second degree murder and attempted first and second degree murder," provides in relevant part that:

(2) Except as provided in section 706–657, pertaining to enhanced sentence for second degree murder, *persons convicted of* second degree murder and *attempted second degree murder shall be sentenced to life imprisonment with possibility of parole.* The minimum length of imprisonment shall be determined by the Hawaii paroling authority; provided that persons who are repeat offenders under section 706–606.5 shall serve at least the applicable mandatory minimum term of imprisonment.

(Emphases added.)

gree murder) (Count I); (2) place to keep pistol or revolver, HRS § 134–6(c) & (e) (Supp.2002)[28] (place to keep a firearm) (Count II); and (3) carrying, using or threatening to use a firearm in the commission of a separate felony, HRS § 134–6(a) & (e) (Supp. 2002)[29] (use of a firearm) (Count III). The court sentenced Defendant on November 19, 2003 as follows: (1) Count I, life with the possibility of parole; (2) Count II, ten years; and (3) Count III, twenty years. In addition, the court sentenced Defendant on Count I to a mandatory minimum term of three years pursuant to HRS § 706–660.1 (1993).[30]

IX.

To convict Defendant of attempted second degree murder, the prosecution was required to prove that he: either (1) "intentionally engage[d] in conduct which would constitute [second degree murder] if the attendant circumstances were as [Defendant] believe[d] them to be" or (b) "intentionally engage[d] in conduct, which under the circumstances as [Defendant] believe[d] them to be, constitute[d] a substantial step in the course of conduct intended to culminate in [his] commission of [second degree murder]." HRS § 705–500. Second degree murder requires

28. HRS § 134–6(c) states that
[e]xcept as provided in sections 134–5 *and 134–9, all firearms* and ammunition *shall be confined to the possessor's place of business, residence, or sojourn;* provided that it shall be lawful to carry unloaded firearms or ammunition or both in an enclosed container from the place of purchase to the purchaser's place of business, residence, or sojourn, or between these places upon change of place of business, residence, or sojourn, or between these places and the following: a place of repair; a target range; a licensed dealer's place of business; an organized, scheduled firearms show or exhibit; a place of formal hunter or firearm use training or instruction; or a police station. "Enclosed container" means a rigidly constructed receptacle, or a commercially manufactured gun case, or the equivalent thereof that completely encloses the firearm.
(Emphases added.)
HRS § 134–6(e) states that
[a]ny person violating subsection (a) or (b) shall be guilty of a class A felony. *Any person violating this section by carrying or possessing a loaded firearm or by carrying or possessing a loaded or unloaded pistol or revolver without a license* issued as provided in section *134–9 shall be guilty of a class B felony.* Any person violating this section by carrying or possessing an unloaded firearm, other than a pistol or revolver, shall be guilty of a class C felony. *.A conviction and sentence under subsection (a)* or (b) *shall be in addition to and not in lieu of any conviction and sentence for the separate felony;* provided that the sentence imposed under subsection (a) or (b) *may run concurrently or consecutively with the sentence for the separate felony.*
(Emphases added.)
HRS § 134–9(c) states, in relevant part, that "[n]o person shall carry concealed or unconcealed on the person a pistol or revolver without being licensed to do so under this section or in compliance with section[ ] ... 134–6."

29. HRS § 134–6(a) provides in pertinent part that

[i]t *shall be unlawful for a person to knowingly carry on the person or have within the person's immediate control or intentionally use or threaten to use a firearm while engaged in the commission of a separate felony,* whether the firearm was loaded or not, and whether operable or not[.]
(Emphasis added.) *See supra* note 28 for relevant language of HRS § 134–6(e).

30. HRS § 706–660.1, entitled "Sentence of imprisonment for use of a firearm, semiautomatic firearm, or automatic firearm in a felony," states in relevant part that:
(1) *A person convicted of a felony, where the person had a firearm in the person's possession or threatened its use or used the firearm while engaged in the commission of the felony, whether the firearm was loaded or not, and whether operable or not, may* in addition to the indeterminate term of imprisonment provided for the grade of offense *be sentenced to a mandatory minimum term of imprisonment without possibility of parole or probation the length of which shall be as follows:*
(a) *For murder in the second degree and attempted murder in the second degree—up to fifteen years;*
(b) For a class A felony—up to ten years;
(c) For a class B felony—up to five years; and
(d) For a class C felony—up to three years. The sentence of imprisonment for a felony involving the use of a firearm as provided in this subsection shall not be subject to the procedure for determining minimum term of imprisonment prescribed under section 706–669; provided further that a person who is imprisoned in a correctional institution as provided in this subsection *shall become subject to the parole procedure as prescribed in section 706–670 only upon the expiration of the term of mandatory imprisonment fixed under paragraph (a), (b), (c), or (d).*
(Emphases added.)

proof that a person "intentionally or knowingly cause[d] the death of another person." HRS § 707–701.5. Finding no. 16 by the court that "[Defendant] intentionally and knowingly used a .22 caliber revolver to fire a single shot into Stoesser's right eye" and finding no. 17 that he was aware such conduct was a substantial step that would lead to Stoesser's death, establish that Defendant's conduct constituted attempted second degree murder, *i.e.* the act of shooting Stoesser in an attempt to cause Stoesser's death.

Applying the same conduct test to Count III, to prove *use* of a firearm in violation of HRS § 134–6(a) & (e), the prosecution was required to prove "conduct," such that, while engaged in a felony, Defendant (1) "knowingly carr[ied]" on his person a firearm, or (2) "knowingly ha[d]" within his "immediate control" a firearm, or (3) "intentionally use[d]" a firearm, or (4) "intentionally threaten[ed] to use a firearm." HRS § 134–6(a). *See supra* notes 28 and 29. The evidence that Defendant shot Stoesser is the same evidence that proves any one of the first three alternative conduct requirements establishing use of a firearm in violation of HRS §§ 134–6(a) & (e), *i.e.*, that Defendant knowingly carried, or had, or intentionally used a firearm in the commission of the felony, in this case, attempted second degree murder. Because the same conduct constitutes proof of both attempted second degree murder and use of a firearm, Defendant was convicted of two offenses for the same act.

Applying the same conduct test to Count II, place to keep a firearm, as charged, the prosecution was required to prove under its complaint that Defendant (1) knowingly (a) "carr[ied] or possess[ed] a loaded firearm," or (b) "carr[ied] or possess[ed] a loaded or unloaded [firearm] without a license," HRS § 134–6(e), and (2) knowingly failed to "confine" such firearm to designated places, HRS § 134–6(c). As noted above, findings no. 16 and 17 by the court establish that the same act was used to prove attempted second degree murder *and* use of a firearm. Similarly, the findings subsume proof of the conduct for place to keep a firearm in HRS § 134–6(c) & (e), *i.e.*, that Defendant knowingly carried or possessed a loaded firearm when

he shot Stoesser and, thus, failed to confine the weapon to the possessor's place of business, residence, or sojourn. Accordingly, in proving attempted murder in the second degree, the prosecution established proof of a violation of place to keep a firearm by the same conduct.

Under the findings of the court, the conduct used to prove attempted second degree murder was the same conduct employed to establish violations of use of a firearm and place to keep a firearm. Hence, the same conduct was punished three times by virtue of the separate charges brought in the same trial. Such conduct did not constitute "separate acts that independently constitute separate offenses." *Lessary*, 75 Haw. at 459, 865 P.2d at 156. Insofar as the same act by Defendant resulted in three separate convictions, the sentences imposed for three offenses constituted multiple punishments for the same conduct violative of the Hawai'i double jeopardy clause.

### X.

In order to correct the double jeopardy violations, the convictions and sentences for Count II, place to keep a firearm, and Count III, use of a firearm, must be reversed, leaving conviction of Count I, attempted murder in the second degree, to stand. *See Jumila*, 87 Hawai'i at 3, 950 P.2d at 1203, *overruled on other grounds, Brantley*, 99 Hawai'i 463, 56 P.3d 1252. "This solution is fair to [Defendant] because it remedies the [double jeopardy] violation[s], and it is fair to the prosecution and the public because it sustains the conviction of the offense of the highest class and grade of which [Defendant] was convicted." *Id.* at 4, 950 P.2d at 1204. The only "punishment" that remains is the sentence for Count I.

Defendant "does not challenge the lower court's sentence of life imprisonment with possibility of parole in Count I [(attempted murder in the second degree)], nor imposition of the mandatory minimum in Count I pursuant to HRS § 706–660.1." Rather, Defendant challenges the sentences for both use of a firearm and HRS § 706–660.1 as imposing "multiple punishments for the same act in violation of double jeopardy." Although I

would reverse the convictions and sentences under both Counts II and III for stemming from the same act, and, hence, resulting in impermissible multiple punishments, I address Defendant's implied argument that a mandatory minimum sentence constitutes a separate "punishment" for double jeopardy purposes and because the majority refers to the mandatory minimum sentence imposed.

A mandatory minimum sentence imposed as a result of a conviction is not another "offense." On its face HRS § 706–660.1 is not an offense, i.e., a crime separate and independent from that of attempted murder in the second degree. *See Monge v. California*, 524 U.S. 721, 728, 118 S.Ct. 2246, 141 L.Ed.2d 615 (1998) ("Historically, [the United States Supreme Court] ha[s] found double jeopardy protections inapplicable to sentencing proceedings because the determinations at issue do not place a defendant in jeopardy for an 'offense.' " (citations omitted)). Although the mandatory sentence imposed is based upon the use of a gun, the predicate facts for such a sentence inhere in the conviction of attempted murder itself. HRS § 706–660.1 provides, in relevant part, as follows:

> (1) *A person convicted of a felony,* where the person had a firearm in the person's possession or threatened its use or used the firearm while engaged in the commission of the felony, whether the firearm was loaded or not, and whether operable or not, *may in addition to the indeterminate term of imprisonment provided for the grade of offense be sentenced to a mandatory minimum term of imprisonment without possibility of parole or probation the length of which shall be as follows:*

**31.** HRS § 706–656(2) (Supp.2004) states in relevant part as follows:

> (2) Except as provided in section 706–657, pertaining to enhanced sentence for second degree murder, persons convicted of second degree murder and attempted second degree murder shall be sentenced to life imprisonment with possibility of parole. *The minimum length of imprisonment shall be determined by the Hawaii paroling authority; provided that persons who are repeat offenders under section 706–606.5 shall serve at least the applicable mandatory minimum term of imprisonment.*

> (a) For murder in the second degree and attempted murder in the second degree—up to fifteen years.

(Emphases added.) Indeed, the prosecution's motion for the imposition of a mandatory minimum term under HRS § 706–660.1 was "based on the trial court's finding that 'Defendant had a firearm in his possession and used said firearm while engaged in the offense of Attempted Murder in the Second Degree.' " Because HRS § 706–660.1 does not constitute an offense but derives from the attempted murder conviction, it is not governed by the double jeopardy clause.

Second, the mandatory minimum sentence allowed under HRS § 706–660.1 does not create multiple punishments flowing from multiple charges or "prosecutions." The mandatory minimum sentence does not extend the indeterminate term of life imprisonment imposed for attempted murder in this case. The mandatory sentence, although allowed to be imposed with the indeterminate term, does not exceed that term, but only directs how a certain period of the indeterminate term is to be served, in this case, mandating that Defendant be imprisoned for at least three years out of the indeterminate term. The application of § 706–660.1, then, does not impose dual punishment inasmuch as the mandatory minimum is coincident with the host sentence.

Hence, Defendant is not punished twice for the same act; he is punished once, the mandatory minimum indicating how he must serve the initial part of his sentence. In effect, the mandatory minimum, then, is a restriction on the parole board's discretion on setting the mandatory minimum sentence a convicted person must serve. *See* HRS § 706–656 (1993 & Supp.2004).[31] Finally, I

> If the court imposes a sentence of life imprisonment without possibility of parole pursuant to 706–657, as part of that sentence, the court shall order the director of public safety and the Hawaii paroling authority to prepare an application for the governor to commute the sentence to life imprisonment with parole at the end of twenty years of imprisonment; provided that persons who are repeat offenders under section 706–606.5 shall serve at least the applicable mandatory minimum term of imprisonment.
>
> (Emphasis added.)

note that in this case, the court imposed all sentences *simultaneously*[32] and ordered that they be served "concurrently."[33] Application of HRS § 706–660.1, then, did not "add" on a second punishment that related to a separate act constituting a separate offense. *Lessary,* 75 Haw. at 459, 865 P.2d at 156.

## XI.

The majority states that its decision is consistent with *State v. Vellina,* 106 Hawai'i 441, 106 P.3d 364 (2005), *State v. Ambrosio,* 72 Haw. 496, 824 P.2d 107 (1992), and *State v. Coelho,* 107 Hawai'i 273, 112 P.3d 759 (App.2005). The decisions in *Vellina*[34] and *Ambrosio*[35] rested upon principles of statutory construction, not double jeopardy analyses. These cases, then, would necessarily be "consistent with" the majority's decision to restrict its constitutional inquiry to a legislative intent analysis. Majority opinion at 664. But, as stated *supra,* where a claim under the Hawai'i double jeopardy clause is brought, *Lessary* requires us to look beyond legislative intent and consider whether a defendant has been prosecuted or punished twice for the same act or acts.

As for *Coelho,* the facts there were similar to the facts in *Vellina.* In *Coelho,* the Intermediate Court of Appeals (ICA) concluded as follows:

**32.** However, a defendant's expectation of finality may preclude sentences imposed or amended on separate occasions. *See Ashley v. State,* 850 So.2d 1265, 1267 (Fla.2003) ("Once a sentence has been imposed and the person begins to serve the sentence, that sentence may not be increased without running afoul of double jeopardy principles."). In this case, all terms of imprisonment were imposed simultaneously in a single final judgment and sentence, and, therefore, constituted one punishment.

**33.** The final judgment and sentence states that "SENTENCE TO BE SERVED CONCURRENTLY WITH EACH OTHER AND WITH ANY OTHER TERM OF INCARCERATION THE DEFENDANT IS NOW SERVING."

**34.** In *Vellina,* we determined that "Vellina's theft of a firearm *was* the entire felony; in other words, *there was no underlying felony that Vellina committed while possessing or using a firearm[, and a]s such, Vellina's conduct [fell] outside the ambit of HRS § 706–660.1."* 106 Hawai'i at 448,

[The defendant] was convicted of being a felon in possession of a firearm; the felonious conduct was the possession of the firearm itself. There was no underlying felony that [the defendant] committed while possessing or using a firearm. Convicting [the defendant] of being a felon in possession of a firearm pursuant to HRS § 134–7(b) and sentencing him to a mandatory minimum term of imprisonment pursuant to HRS § 706–660.1(3)(c) *essentially punished [the defendant] twice for a single possession of a firearm.*

107 Hawai'i at 281, 112 P.3d at 767(emphasis added). For reasons explained *supra,* I do not agree with the ICA's characterization of the mandatory minimum term as being a second "punishment." However, the ICA further reasoned that "[a] rational, sensible, and practicable interpretation of HRS § 706–660.1 is that the legislature did not intend its application for felonies where the *entirety* of the felonious conduct is the use or possession of a firearm. To interpret the statute otherwise would be *unreasonable since it would punish a person twice for a single act." Id.* at 281, 112 P.3d at 767—(emphasis in original and emphasis added). While it relied on the canon of statutory construction favoring reasonable interpretations, the ICA employed language of the "same conduct" test, perceiving the crux of the protections afforded under *Lessary:* that a person cannot be prose-

106 P.3d at 371 (emphasis in original and emphasis added). The majority agrees with this interpretation of *Vellina.* Majority opinion at 664.

**35.** In *Ambrosio,* the trial court, pursuant to HRS § 706–660.1(a)(2), imposed a mandatory minimum of five years for kidnapping and a mandatory minimum of seven years for possession or use of a firearm in the commission of the felony of kidnapping. 72 Haw. at 497, 824 P.2d at 108. The defendant challenged the imposition of the latter mandatory minimum for the possession or use of a firearm charge. *Id.* This court sustained the mandatory minimum for the kidnapping conviction, but vacated the mandatory minimum for the possession or use of a firearm conviction, holding that the "clear and unambiguous" language of HRS § 706–660.1(a)(2) "applie[d] to the conviction for *the felony in which the firearm was used* [,]" *id.,* and not for the separate felony of possession or use of a firearm. The majority apparently agrees with this interpretation of *Ambrosio. See* Majority opinion at 663 n. 21.

cuted or punished more than once for the *same act or acts.* *Coelho,* then, transcended a pure legislative intent analysis. As such, it is not entirely "consistent" with the majority's position in this case.

### XII.

The double jeopardy violations in this case arose out of the multiple charges and resulting convictions that were all based upon Defendant's "same conduct," as established by the *one* "act" of "fir[ing] a single shot into Stoesser's right eye." Hence, only the conviction for the highest grade offense, attempted murder in the second degree, can stand, while the convictions of place to keep a firearm and use of a firearm must be reversed. The remaining sentence of life imprisonment with possibility of parole subject to a mandatory minimum term of three years' imprisonment does not place Defendant twice in jeopardy of the same offense, nor subject him to multiple punishments. Therefore, I would affirm the court's judgment and sentence with respect to Count I and under HRS § 706–660.1, but reverse its judgment and sentence as to Counts II and III.

